694 A.2d 1057

WALTER NACHTIGALL, PLAINTIFF–APPELLANT, v. NEW JERSEY TURNPIKE AUTHORITY, NEW JERSEY HIGHWAY AUTHORITY, SOUTH JERSEY TRANSPORTATION AUTHORITY AND MFS NETWORK TECHNOLOGIES, INC., DEFENDANTS–RESPONDENTS.

IN THE MATTER OF THE PROTEST OF LOCKHEED MARTIN IMS RE: ELECTRONIC TOLL COLLECTION IMPLEMENTATION PROGRAM PROCUREMENT, THE PROTEST OF PROCUREMENT PROCEDURES AND AWARD.

Superior Court of New Jersey
Appellate Division

Argued June 4, 1997—Decided June 12, 1997.

---

126

Before Judges PRESSLER, KESTIN and WECKER.

*Gregory P. Joseph (Fried, Frank, Harris, Shriver & Jacobson)* of the New York bar, admitted pro hac vice, and *Karen A. Confoy (Sterns & Weinroth)* argued the cause for appellant Lockheed Martin IMS Corporation (*Richard K. Weinroth* and *Mr. Joseph*, of counsel; *Ms. Confoy, Robert C. Lewis* and *Richard Joffe*, on the brief).

*Robert.C. Epstein* argued the cause for appellant Walter Nachtigall (*Hannoch Weisman*, attorneys; *Mr. Epstein* and *Ronald M. Sturtz*, on the brief).

*William J. Wolf* argued the cause for respondent New Jersey Turnpike Authority (*Bathgate, Wegener & Wolf*, attorneys; *Mr. Wolf* and *Michael M. DiCicco*, on the brief).

*Salvatore A. Romano (Jenkens & Gilchrist)* of the D.C. bar, admitted pro hac vice, and *Steven E. Brawer (Ravin, Sarasohn, Cook, Baumgarter, Fisch & Rosen)* argued the cause for respondent MFS Network Technologies, Inc. (*Messrs. Romano* and *Brawer*, of counsel and on the brief with *Christopher E. Hartmann, Richard S. Robinson, Scott R. Schoenfeld* and *Gregory J. Casas*).

*Charles W. Hutchinson* appeared for respondent South Jersey Transportation Authority (*Gilmore & Monahan*, attorneys; *Mr. Hutchinson*, on the brief).

The opinion of the court was delivered by

PRESSLER, P.J.A.D.

In the fall of 1995, an *ad hoc* alliance (the Consortium) was formed by mutual resolutions and a memorandum of understanding adopted and executed by four agencies operating New Jersey's toll roads and interstate toll connections, namely, the New Jersey Turnpike Authority (NJTA); the New Jersey Highway Authority (NJHA), operating the Garden State Parkway; the South Jersey Transportation Association (SJTA), operating the Atlantic City Expressway; and the Port Authority of New York and New Jersey (PA). The Delaware Department of Transportation (DDOT) joined the Consortium in the summer of 1996. The single purpose of the Consortium, of which NJTA is the lead agency and which is managed by a representative Executive Council, is to obtain for New Jersey's toll roads, bridges and tunnels, an integrated electronic toll collection (ETC) system, which includes the installation of E–ZPass,[1] and thereby to achieve the obvious

---

[1] As we understand the record, the E–ZPass basic hardware, consisting of transponders, readers and antennae, is patented and manufactured by Mark IV Industries and, by virtual necessity, must be incorporated into any ETC system

benefits to the environment, the public, and motorists inherent in such a system. Following an extensive bidding and negotiation process spanning many months and involving two bidders, MFS Network Technologies, Inc. (MFS) and Lockheed Martin IMS (Lockheed), the Consortium awarded the contract to MFS. That award was challenged both by Lockheed, who filed a notice of appeal directly with this court, and a taxpayer, Walter Nachtigall, whose action against the Consortium was transferred to this court by the Law Division pursuant to *R.* 1:13–4. We consolidated and accelerated the two appeals, and we now affirm the contract award to MFS.

As we view the matter, although the appellants raise between them a number of alleged defects in the procurement process, which we will address *seriatim* hereafter, the fundamental question we must decide is whether that process comported with the applicable public bidding and procurement laws of this State. There is no dispute that a lowest-responsible-bidder standard is statutorily prescribed at least for the three New Jersey agency Consortium members. *See N.J.S.A.* 27:12B–5.2, 23–6.1, and 25A–8. Nor is there any dispute that the procurement process here employed did not strictly conform to that standard. The Consortium's position is that the undertaking to install, implement, and service this type of ETC system constitutes the provision of a variety of integrated professional services which are exempt under the foregoing statutes from public bidding requirements. The Consortium also contends that the procedures it did employ were not only predicated upon obtaining the most advantageous transaction for the State, but also accomplished that purpose within the framework of the basic procedures, spirit and philosophy of competitive public bidding under *N.J.S.A.* 52:34–12, which permits the State to award competitively bid contracts, not to the lowest bidder, but to that bidder whose proposal is "most advantageous to the State, price and other factors considered." Those proce-

---

and was in fact specified by the Consortium from the outset as the hardware to be employed.

dures, we note, included the initial issuance of its Request for Information and Request for Qualifications (RFI/RFQ); the issuance of the Request for Proposals (RFP); the issuance of Best and Final Offer (BAFO) Guidelines; the numerous consultations, conferences and clarifications between Consortium personnel and the two bidders; the professional evaluation of the proposals by the Consortium's Multi–Discipline Evaluation Team (MET); and the consideration of Lockheed's two separate protests. Having carefully reviewed this voluminous record, which documents every stage of the procurement process in excruciating detail, and having considered the extensive oral arguments of counsel, we are persuaded that the Consortium is correct in both of these contentions.

Explanation of our conclusion requires a description of what the ETC system essentially is. As we understand it, the system has these basic components. First, of course, is the hardware, signage, traffic reconfiguration, and other implementing procedures and devices that have to be installed at every toll site. That, however, is just the beginning. Second is the heart of the system, namely the customer service center network (CSC) and the necessary communication links between the toll booth and the CSC and between the CSC and users, banks, credit card companies, member agencies, and all the other entities involved in the ultimate collection of tolls and fines from the motorists, and their transmittal to the entity entitled to the receipt thereof. In short, the CSC is intended to operate as an integrated and complex financial entity providing banking, trust, credit, billing, collection, payment, reporting, marketing, and violation detection and fine collection functions both for the Consortium and the ETC users. Obviously a great deal of specially designed computer software is necessary to support the efficient performance of these functions. The third basic component of the system is the communication link itself, virtually all parties involved agreeing that fiber optic cable constitutes the present state of the art in communication access media. And finally, the fourth basic component is the method by which the installation and operation of the system is to be financed.

In the documents constituting the RFI/RFQ, the Consortium announced that it was looking for a combination of the best value and the best system as proposed by the bidder. That is to say, although the Consortium knew and was able to specify much of the detail of a basic ETC system, at least on a preliminary basis, it sought, because of the complexity of the system as a whole and the variety of possible ways of structuring it, the input of the bidders as to the ultimate design, implementation, management and financing of the system. This was made perfectly clear by the cover letter sent to RFI/RFQ responders, which explained, in pertinent part, as follows:

> The Consortium is interested in determining to what extent there is interest in providing the services outlined herein, and to provide an opportunity for the vendor community to 'shape the development' of the RFP by capitalizing on their experience and innovation. The Consortium is also interested in determining if there are any special problems, considerations or options that would achieve a more effective implementation of this regional initiative. The Consortium encourages questions or comments from prospective vendors on any issue or concern, as it pertains to this program.

This concept was also expressed by Addendum No. 1 to the RFP providing in pertinent part that:

> The process described in the RFP may lead to the evaluation of proposals that differ in ways other than price. The approach taken by each of the Proposers to the various elements of the RFP may differ and the encouragement for innovative and creative approaches to the RFP may lead to substantially different proposals. The negotiated contract process initiated by the Consortium through this RFP anticipates that the bids to be reviewed will be different in many aspects, but the Consortium reserves the right to select the best value to the Consortium and its individual agency members through the RFP process....

In sum, the ultimate system embodied in the MFS proposal that was accepted by the Consortium was the result of what was actually an evolutionary process as contemplated by the RFI/RFQ and further developed by the RFP, the pre- and post-RFP conferences between Consortium representatives and the two bidders, the issuance by the Consortium of BAFO guidelines, the bidders' respective BAFOs and the post-BAFO clarifications and negotiations for and with each bidder. Of critical significance is the fact—which we deem undisputed by the record and will refer to again hereafter—that at every step of the process, and as the

Consortium began more discretely to define for itself how it wanted the system to be designed, operated and financed—basing its preferences on the bidders' proposals, the available options for each of the system components, and the way these options would be coordinated—the Consortium afforded both bidders, including Lockheed, the opportunity to revise and refine their proposals.

In essence, these are the significant components of the MFS proposal beyond the equipping of the toll booths and providing implementing signage, devices, and traffic consultation services. The contract period is to be for an eight-year term. The CSC is to be physically located in premises leased by MFS at its expense. The entire operation of the CSC is to be subcontracted to Chase Manhattan Bank. All the software to be specially designed for the functioning of the system, which MFS will be responsible for producing and maintaining, will revert to the Consortium's ownership at the end of the contract period. The hardware, once installed, will belong to the Consortium. All tolls collected will be transmitted to the Consortium member entitled thereto. MFS will administer the program of identifying violators and collecting a $25 fine pursuant to L. 1997, c. 59, approved April 2, 1997, and enacted to complement the ETC system. The communications link will be by fiber optic cable that MFS will install along the same four hundred miles of the toll roads.

A significant feature of the MFS proposal, responsive to the financing component, is that it is designed to be both self-funding and revenue-generating. That is to say, the Consortium members will obtain all the services and equipment necessary to operate the ETC system without payment and is likely, as well, to obtain additional revenue from its overall operation. As we understand it, the self-funding will be accomplished in two ways. First, MFS will retain the fines paid for violations. Second, it will receive income by acting as broker for the State for marketing and leasing the excess fiber optic cable, which, upon installation, will belong to the Consortium. As we understand the proposal, fiber optic cable consists of separate strands, each of which has independent capac-

ity. Operation of the ETC system as proposed by MFS will require about eight to twelve strands. MFS proposes to install along the right of way of the Consortium members an underground cable with a capacity of approximately one hundred strands. The Consortium will, therefore, have more than ninety strands available for lease to such users as telecommunications companies, internet providers, and others requiring communication access. MFS, a specialist in communications access provision, will act as broker for the Consortium in leasing access to the cable, subject to the Consortium's approval of each lease. MFS will receive a 15% brokerage fee during the eight-year term of the contract, the Consortium receiving the balance of the lease consideration. It is apparently the expectation of the Consortium and MFS that the violations fines and the 15% brokerage fee will at least equal MFS's costs of installation, operation, and management of the system, and that the Consortium will realize additional revenues out of the fiber optic leases. In the event, however, that MFS has not recouped its costs by the end of the eight-year period, the Consortium will then be obligated to pay MFS the difference between income and costs but will have the lease revenues out of which to do so if that becomes necessary. By the end of that period, as we have already noted, all the system's hardware and software will all belong to the Consortium.

We cannot, of course, second guess the Consortium's business judgment in concluding that the MFS proposal we have described was more advantageous than that of Lockheed, whose proposal was not fully self-funding, whose fiber optic proposal was substantially more limited, and whose brokerage proposal appeared to be less favorable to the State.[2] We nevertheless think it plain that if the projections made by the Consortium and MFS are valid, and they appear to be based on reliable data, it cannot be said that the Consortium members mistakenly exercised their authority and

---

[2] Lockheed offered several lease/brokerage proposals, none of which appears to have been as definitive nor as certainly advantageous to the Consortium as the MFS proposal and most of which appear to be distinctly less advantageous.

discretion in concluding that for these and a myriad of other technical reasons the MFS proposal better served their interests and those of the public.[3] Quite the contrary appears to be so.

---

[3] The Resolution of the NJTA, adopted March 25, 1997, on the express authority of the other Consortium members, explained the choice of the MFS proposal as follows:

> An extensive review and evaluation of these proposal documents was conducted by the MET with a recommendation for award to MFS Network Technologies presented to the Consortium Executive Council on October 17, 1996. The Executive Council unanimously approved the recommendation of MFS Network Technologies. The selected MFS proposal provides the Consortium the following:

1. An experienced, highly qualified team of firms with the expertise to successfully execute each element of the Electronic Toll Collection Implementation Program.
2. A cost efficient ETC system, and replacement of outdated computer and toll equipment with proven state-of-the-art technology for the NJTA and NJHA. This system also includes the design and installation of an automated vehicle classification system and traffic signage for all toll plazas on the NJTA and NJHA.
3. An extensive communication system, which will provide each agency with improved communications capabilities for the transmission of electronic toll data and other transportation projects.
4. A regional Customer Service Center to enroll ETC customers, market the ETC system, manage patron accounts, provide financial settlement and accounting among the Consortium and other agencies and administratively process toll violations. This center will be operated for eight years and will have the capability to expand its customer services beyond the five participating agencies to other toll facilities.
5. Proposal options that include transportation technology initiatives and business opportunities built from an electronic toll collection and communications infrastructure foundation that provides significant revenue potential such as:
 — Leasing of excess capacity in the Consortium's fiber optic infrastructure;
 — Supplemental use of ETC transponders for parking applications;
 — Introduction of Smart Cards;
 — Creation of a national customer service center from the Consortium's operation.
6. No payments from the Consortium to the vendor for eight years. The projected proceeds exceed capital and operating costs. The Consortium will receive all excess proceeds. Correspondingly, the Consortium is responsible for costs that exceed proceeds at the end of eight years.

This summary of the reasons for the choice of MFS over Lockheed, echoed the sentiments expressed by the Consortium's representatives at a public meeting

■ Against this background, we consider whether the proposal, as an integrated whole, is one for the rendering of professional services exempt from the strictures of the bidding laws governing the three New Jersey Consortium members. We recognize that the proposal has some individual aspects that are not themselves professional services, such as digging the trench for the fiber optic cable and laying it, and providing the patented hardware. But we also think it plain that these elements of the proposal are inseparable from the predominant nature of the entire proposal, which is, essentially, an agreement by MFS to provide a combination of coordinated professional services, namely traffic-consulting services; the highly specialized financial and marketing services involved in designing, operating, and servicing the CSC; the development of the highly sophisticated software essential to the

---

of NJTA on November 26, 1996, the minutes of that meeting providing, in relevant part, that:

> Mr. Gross [Acting Executive Director of the NJTA and a member of the Consortium's Executive Council] then introduced David Mortimer, Chief of Staff of the New Jersey Department of Transportation, and Paul Carris, ETC Program Manager. They presented an overview of the Program including (1) the procurement process used to arrive at a recommendation for award; (2) the unique nature of the procurement based on its technical complexity and the participation of multi-state agencies; and (3) the benefits which will flow to the motoring public upon implementation. Further, a summary of each proposal was presented, highlighting the superior quality of the MFS proposal which led to the recommendation of the multi-agency review committee and unanimous endorsement of the Executive Council for MFS to receive the award.

> The cumulative strength of MFS Network Technologies is what differentiated them from their only competitor, Lockheed Martin IMS Corp. The innovative consumer marketing strategy for transponders and the inclusion of a nationally recognized customer service center operator, Chase Manhattan Bank, were important factors in the decision-making process. Other major elements of the MFS proposal include:

> — Forecasted Gross Receipts of $647 million;
> — Non-exclusive fiber optics network;
> — No impact on New Jersey's development of a statewide fiber optics request for proposal;
> — Additional marketing efforts to enhance uses of ETC transponders to areas such as parking, transit and related transportation uses.

running of the coordinated system; and the provision of brokerage services involving the marketing and leasing of highly technical communication access facilities.

The bidding statutes do not define "professional services." That phrase has, however, been invested with considerable substantive content by the Supreme Court in *Autotote Ltd. v. New Jersey Sports & Expo. Auth.*, 85 *N.J.* 363, 427 *A.*2d 55 (1981), and *N.E.R.I. Corp. v. New Jersey Highway Auth.*, 147 *N.J.* 223, 686 *A.*2d 328 (1996). *Autotote* involved the installation and servicing of parimutuel betting equipment, namely a totalisator system which, in order to fulfill its purpose, was required to be fast and reliable, with the capacity to process huge amounts of data instantaneously. It also required the presence of a staff of technicians to supervise day-to-day operations. In considering whether the installation and servicing contract was one for professional services, the Court pointed out that "the term 'professional services' is no longer limited to the traditional professions such as law and medicine.... If the law is to keep pace with scientific developments in business and commerce, it must adapt statutory provisions, such as the one in question, to the realities of the day." 85 *N.J.* at 371, 427 *A.*2d 55. Because it concluded that performance of the contract required scientific knowledge or professional skill, the Court was satisfied that its essence was the rendering of professional services within the standard statutory provision excepting such services from competitive bidding and award of the contract to the lowest responsible bidder.

*N.E.R.I.* is instructive as well. Involved there was a public contract for the towing of disabled automobiles off the Garden State Parkway. The Court concluded that towing of automobiles did not constitute professional services—a rather obvious proposition in our view. And while it did not undertake definitively to circumscribe the meaning of professional services for purposes of the competitive bidding exemption—an exercise hardly called for by the nature of the contract before it—the Court did note that a number of New Jersey statutes define professional services in

other contexts and that resort to those statutes is helpful. 147 *N.J.* at 237–238, 686 *A.*2d 328.

These statutes variously define professional services both in terms of the specific services being performed and in general terms describing the nature of services that qualify for that categorization. Among the specific professional services are those recognized by *N.J.S.A.* 34:1B–7.22, which include, among others, engineering, inspecting, planning, legal and financial services. Among the general descriptions is that contained in *N.J.S.A.* 40A:11–2, providing that:

> Professional services means services rendered or performed by a person authorized by law to practice a recognized profession, whose practice is regulated by law, and the performance of which services requires knowledge of an advanced type in a field of learning acquired by a prolonged formal course of specialized instruction and study as distinguished from general academic instruction or apprenticeship and training. Professional services may also mean services rendered in the performance of work that is original and creative in character in a recognized field of artistic endeavor.

We are persuaded that if the installation and servicing of the totalisator system in *Autotote* constituted professional services, then this contract for the provision of a complex, multi-faceted ETC system cannot possibly be regarded as anything but a professional-services contract. Far beyond the single subject of the *Autotote* contract, we have here an integrated combination of sophisticated banking, financial, marketing, and traffic consulting services; the design and implementation of sophisticated software; the provision of a leasable fiber optic cable and the engineering, marketing and brokerage services incident thereto; and the planned operation of the system as a self-funding enterprise also producing additional revenue for the Consortium members.[4] We think it plain that the financial, brokering, marketing and panoply

---

[4] Supportive of the proposition that the banking services involved in the ETC system constitute a dominant aspect of its operation is the fact that of the four bidders who were prequalified under the RFI/RFQ, two were banks, Chase Manhattan Bank, who eventually became MFS's subcontractor, and Valley National Bank. The other two were MFS and Lockheed, and only they responded to the ensuing RFP.

of technological and consulting services which are the essence of this contract are each, individually, services of a professional nature. They do not lose that character by being integrated into a creative proposal that affords clear financial advantage to the Consortium. Indeed, that character is exponentially enhanced by the necessity of integrating and coordinating these various services.

▊ Even though we have concluded that the contract here involved is one for professional services exempt from the competitive bidding laws requiring award to the lowest responsible bidder, we are also satisfied that the Consortium, having undertaken an open bidding process, was required to do so fairly to the bidders; and was required to proceed without either the actuality or the appearance of fraud, corruption, favoritism or extravagance. *See Commonwealth v. Dixon Contracting Company, Inc.*, 80 *Pa. Cmwlth.* 438, 471 *A.2d* 934 (1984). [5] Our review of this voluminous record persuades us that despite its claims to the contrary, Lockheed was treated fairly in respect of its interest as well as that of the public.

The main thrust of Lockheed's unfairness claim is that it was never advised, or at least advised too late, that the Consortium wanted a full fiber optic communications link and that, in fact, the Consortium's consultant, Kingston Cole, who was also the New Jersey Department of Transportation's fiber optic consultant, had deliberately misled it as to the significance of a fiber optic component of the proposal. Lockheed also complained that it was not timely informed of the Consortium's interest in a self-funding financing plan, and that the Consortium unfairly modified its

---

[5] We need not address the question of what procedures, if any, must be employed by a public agency in contracting for exempt professional services in light of the fact that the procedures here were calculated to conform as nearly as possible, consistent with the nature of this contract, with a formal competitive bidding process. *See, e.g., Agorganic, Inc. v. Ocean County Utilities Auth.*, 259 *N.J.Super.* 377, 386–387, 613 *A.2d* 511 (Law Div.1992).

evaluation criteria and requirements as the procurement process went on.

Lockheed raised these issues by way of a protest addressed to the NJTA on October 21, 1996, four days after the Consortium's Executive Council had voted to endorse the final MET evaluation and recommendation that the MFS proposal be accepted. The protest proceedings were conducted by Edward Gross, acting Executive Director of the NJTA as hearing officer, who issued a detailed opinion disallowing the protest after an extensive evidential and adversarial hearing.

■ As to Lockheed's claims with which we are here concerned, namely those addressing the asserted unfairness to it of the procurement process, and, in particular, asserted unfairness in respect of the fiber optic option and full self-funding, Gross found as a fact that it had been Lockheed's intention, during the time period between the issuance of the RFI/RFQ and the issuance of the RFP, to attempt to dissuade the Consortium from relying on fiber optic cable since, apparently, it recognized MFS's superiority in that regard. Gross further found that as a result of the issuance of the RFP, Lockheed well understood that the Consortium was extremely interested in a fiber optic network and, accordingly, Lockheed's responsive proposal actually included an extensive fiber optic option. Gross attributed Lockheed's inferior fiber optic option not to any contrary advice or misrepresentation by the Consortium's staff, including Cole, but rather to its "boardroom decision" to develop that option by relying on a subcontractor who was "a highly qualified electrical contractor capable of installing fiber optics but without stature as a major telecommunications company whose business is to evaluate and market fiber optics to third parties." In effect, therefore, Gross found that Lockheed's course of action in putting together its proposal actually deprived the Consortium of the highly sophisticated fiber optic leasing services that were so attractive in the MFS proposal.

■ Our review of the record persuades us that Gross's findings that MFS and Lockheed were on equal footing in respect of the

fiber option are fully supported by the documentary and testimonial evidence. That is also so with respect to his conclusions that the fiber optic option for the toll roads as part of the ETC system was not demonstrated to have the potential of substantially interfering with a proposed Department of Transportation state-wide fiber optic "backbone," and that the failure of the RFI/RFQ expressly to require a fiber optic network as the communication medium for the ETC system was not demonstrated to have had the capacity of discouraging major telecommunications companies from submitting responses. We are not at liberty to disregard administrative fact-finding amply supported by the record, and we will not do so here. *See, e.g., George Harms Constr. Co., Inc. v. New Jersey Turnpike Auth.,* 137 *N.J.* 8, 27, 644 *A.2d* 76 (1994); *R.* 2:11–3(e)(1)(D). *See also Commercial Cleaning Corp. v. Sullivan,* 47 *N.J.* 539, 549, 222 *A.2d* 4 (1966) ("the courts will not interfere [in State contract awards] in the absence of bad faith, corruption, fraud or gross abuse of discretion.").

We are also satisfied that Lockheed was afforded the opportunity to include a self-funding system in its amended BAFO. Lockheed complains that it was not allowed sufficient time to develop one. We are satisfied that this claim is disingenuous. First, Volume V of the RFP made clear to bidders that, as Gross phrased it, the Consortium was inviting bidders to propose "options designed to reduce cost and/or provide revenue while maintaining the core project elements and specified functional ability and performance criteria." MFS came up with a better option to fulfill this purpose than Lockheed. Lockheed was nevertheless given the opportunity to attempt to devise a self-funding component of its BAFO. If it deemed the time allowed insufficient, it could have requested an extension, but did not.

Having found that the two bidders were fairly and commonly treated by the procurement process, we make this additional observation. We have concluded, for the reasons herein set forth, that the fundamental tenor of the ETC contract is that of combined and integrated professional services of various types, and

for that reason the Consortium did not violate the applicable bidding statutes of its three New Jersey members by negotiating with the two bidders within the framework of the RFP in an effort to obtain the most advantageous contract. We question, however, whether those bidding statutes, although they bind the individual members in their individual contracting, also bind the Consortium as a whole. That is to say, the Consortium may be viewed as greater than the sum of its parts, affecting, as it does, a sister jurisdiction, Delaware, and the Port Authority, created by inter-state compact with Congressional approval. The Consortium, both because of the state-wide scope of the ETC system and because of the actual or virtual sovereignty of two of its members, may well be deemed to qualify for the State's competitive bidding standard as prescribed by *N.J.S.A.* 52:34–12, that is, a contract award made from among bidders standing on a level ground based not on lowest bid alone but on the more flexible "most advanta-geous" standard. Indeed, as we have indicated, that was basically the approach the Consortium sought to employ and that, we are satisfied, was actually employed. It is true that the two bidders were not responding to a single set of specifications. But they were responding to a concept whose options provided equal foot-ing and their respective proposals were evaluated and scored by a single set of standards. Considering the complexity of the pro-ject, we are satisfied that these factors were an adequate substi-tute for the single set of specifications adequate for conventionally contracted projects. This is not a conventional project.

Having found no legal deficiency in the procurement process and the manner in which it was implemented, we address the remaining issues raised by the parties. We consider first the balance of Lockheed's contentions.

Lockheed argues that a real or apparent conflict of interest involving Frank Wilson, Commissioner of the New Jersey Depart-ment of Transportation and Chairman of the Consortium's Execu-tive Council, irretrievably tainted the award to MFS. This conten-tion was part of Lockheed's original protest that was considered

and rejected by Gross. We are satisfied that Gross's factual findings in support of his rejection of the claim are amply supported by the record, and we defer to those findings as well.

This is what the conflict claim is all about. On August 20, 1996, Wilson, as Commissioner of Transportation and without reference to the Consortium at all, wrote a letter to a number of public officials in the executive branch, including the Governor herself, advising them that he was recusing himself from involvement in the Department's business dealings with three named firms, AE Comm, Booz Allen & Hamilton, and Dames & Moore. He also advised that he was delegating the handling of this business to the Deputy Transportation Commissioner, Sharon L. Landers. Obviously, none of these three companies were prime Consortium bidders and it does not appear that when Wilson wrote the August 20 letter, he had the Consortium in mind at all. On September 3, 1996, during the course of a meeting with Consortium consultants and project managers, Wilson first learned that Frederick R. Harris, a subsidiary of AE Comm, was a proposed engineering subcontractor of MFS. He also then learned that Booz Allen & Hamilton was a direct Lockheed subcontractor. The basis of Wilson's original recusal was the fact that he had undertaken employment negotiations with Daniel, Mann, Johnson & Mendenhall, another subsidiary of AE Comm which was not, however, involved with either bidder, and he had also undertaken employment negotiations with Booz Allen & Hamilton. When Wilson discovered these connections, both direct and indirect, between AE Comm and Booz Allen and the Consortium, he immediately recused himself from further participation on behalf of the Consortium in any discussions relating to the ETC procurement process and, in fact, terminated the meeting he was attending, which, as we understand it, was a briefing on the status of the procurement.

The crux of Lockheed's conflict of interest claim is that on several occasions after August 20, 1996, Wilson had involved himself in the procurement process in violation of his own recusal.

Gross reviewed Lockheed's asserted proofs of these alleged involvements and concluded that "the record failed to produce any credible evidence that Commissioner Wilson violated his voluntary recusal" as set forth in the letter. This conclusion and the findings on which it is based are supported by the record. Again we will not interfere.[6] We note, moreover, that the record supports Gross's observation that:

> The effect of Lockheed's baseless charges against Commissioner Wilson as set forth in its protest letter caused a public questioning of the integrity and ethics of this man. Irrespective that this decision fully exonerates him, the Commissioner will not go unscarred in the eyes of the public. Lockheed's charges against the Commissioner, without any supporting evidence, only adds to the public cynicism. The Commissioner will continually battle to preserve his reputation. Lockheed will just move on to another procurement. There appears to be significant inequity in this result.

Obviously, an unsuccessful bidder who creates a taint by making unjustified accusations and innuendoes cannot thereafter be rewarded by being allowed to vitiate the procurement process by relying on that taint.

In any event, MFS and Frederick R. Harris agreed that Harris would withdraw from the MFS team in order to avoid any possible appearance of impropriety stemming from the fact that Wilson had negotiated for employment with Harris's sister subsidiary of AE Comm. As a result, after the original evaluation of the BAFOs, MFS offered as a substitute subcontractor Ganett–Fleming, which was accepted by the Consortium in that capacity. Lockheed then filed its second protest with the NJTA, alleging that no substitution of subcontractor could be made after the last amended BAFO had been submitted. This protest was heard by Diane Scaccetti, Chief of Staff of NJTA, designated as the hearing officer by Gross. Scaccetti was satisfied that under the circumstances, the Consortium could, in its discretion and upon its

---

[6] We note that Wilson's alleged conflict was the subject of proceedings before the Executive Commission on Ethical Standards, which concluded that Wilson's conduct in no way tainted the award, although his conduct had a technical appearance of impropriety but only in respect of his employment negotiations with Booz Allen, Lockheed's subcontractor.

evaluation, accept a post-BAFO substitution without violating the mandatory and material terms of the RFP. We agree.

■ Despite the extensive discovery afforded by the Consortium to Lockheed and the extensive ensuing evidential and adversarial hearing, Lockheed asserts that it was denied adequate due process in respect of the protest proceedings because its notice time was too short, discovery was unduly limited, relevant evidence was excluded, both hearing officers had a conflict of interest, and Scaccetti lacked authority to act as a hearing officer. We reject each of these contentions. The due process rights of a bid protester were clearly delineated by the Supreme Court in *Commercial Cleaning Corp. v. Sullivan, supra,* 47 *N.J.* at 550, 222 *A.*2d 4. *See also George Harms, supra,* 137 *N.J.* at 19–20, 644 *A.*2d 76. In sum, a plenary quasi-judicial hearing need not be afforded provided there is a fair opportunity, consistent with the desideratum of a fair and expeditious conclusion of the procurement process, for the protesting bidder to present the facts and law supporting the protest. *See also N.J.A.C.* 19:9–2.1. We think it plain that Lockheed had at least that opportunity. We are also satisfied that there is no support for Lockheed's claim that either hearing officer had a conflict of interest. Finally, we reject Lockheed's claim that if the head of an agency does not himself or herself act as hearing officer, the matter must be transferred to the Office of Administrative Law for trial by an administrative law judge. We find no support for this proposition, especially where the hearing officer is invested with final decision-making authority. *N.J.A.C.* 19:9–2.8(d).

We turn now to Nachtigall's complaints, which we find equally unmeritorious, although we are satisfied that since he is a taxpayer, he has the right to raise them. To begin with, Nachtigall, like Lockheed, challenges the procurement process on the basis of the lowest responsible bidder statutes. We have already dealt with that claim.

■ Nachtigall also claims that his action, commenced in the Law Division, was improperly transferred to this court. He

contends that since the New Jersey Consortium members are not state agencies, suits against them are not allocated to the business of this court pursuant to *R.* 2:2–3(a)(2). Irrespective of whatever validity this contention might have with respect to bidding litigation against an individual New Jersey Consortium member, we think it plain that the Consortium, for the reasons we have already set forth, transcends the status of any one of its New Jersey member agencies and is entitled, *ad hoc* though it may be, to be regarded as a state agency for purposes of determining jurisdiction to entertain actions in lieu of prerogative writs. Our conclusion finds further support in our conviction that Nachtigall raises legal issues determinable without further factual proof.

 We also reject Nachtigall's claim that the Consortium itself is *ultra vires.* We need simply point out that each of the New Jersey agencies is authorized by statute to take such action as may be necessary or convenient in the carrying out of its mandate. *See N.J.S.A.* 27:12B–5(s) (NJHA), 27:23–5(*o*) (NJTA), 27:25A–7(x) (SJTA). *See also N.J.A.C.* 19:2–7.6, 19:8–5.17 and 19:9–2.5, authorizing cooperative contracting by, respectively, SJTA, NJHA and NJTA. Plainly, a regional integrated ETC system is such an action. We further point out that the Delaware DOT is expressly authorized to enter into such inter-state agreements, *see* 17 *Del.C.* § 151. Moreover, we are also satisfied that by entering the Consortium, none of the members improperly delegated its own powers since the separate concurring action of each member is necessary for Consortium action.

Clearly, Nachtigall's claim that the fiber-optic component of the ETC contract constitutes a giveaway of valuable public rights mischaracterizes the nature of that component. As we have noted, Hearing Officer Gross found that the fiber-optic component of the ETC contract was not likely adversely to affect any projected state-wide fiber-optic backbone. Beyond that, it is plain that the fiber-optic component does not constitute a giveaway at all. Under the MFS proposal, the Consortium will receive the benefit of installation of the cable and the cable itself at no cost to

it, will receive 85% of the lease revenues for eight years, and will obtain, also at no cost to it, the communication link necessary for the operation of the ETC system. Rather than being a giveaway, this proposal confers a positive advantage on the Consortium members and the public.

Finally, we are satisfied that all other issues raised by Nachtigall have already been dealt with or are without merit. *R.* 2:11–3(e)(1)(E).

The award by the Consortium of the ETC contract to MFS Network Technologies, Inc., challenged by both appellants, is affirmed.