**COMMONWEALTH EDISON CO. v. NATIONAL LABOR RELATIONS BOARD.**

No. 8190.

Circuit Court of Appeals, Seventh Circuit.

May 22, 1943.

Rehearing Denied June 22, 1943.

Ralph R. Bradley, of Chicago, Ill., and Roger Robb, of Washington, D. C., for petitioner.

David Karasick, of Chicago, Ill., and Robert B. Watts, Gen. Counsel, Ernest A. Gross, Associate Gen. Counsel, Howard Lichtenstein, Asst. Gen. Counsel, and David Findling and Maurice R. Kraines, Attys., National Labor Relations Board all of Washington, D. C., for respondent.

Before MAJOR, KERNER, and MINTON, Circuit Judges.

MAJOR, Circuit Judge.

This is a petition to review and set aside an order issued against petitioner by respondent, pursuant to Sec. 10(c) of the National Labor Relations Act, 29 U.S.C.A. § 151, et seq. In answer to the petition, the Board requested enforcement of its order.

Petitioner, a public utility corporation, is engaged directly and through operating subsidiaries, in the production, purchase, transmission, distribution and sale of electric current in the state of Illinois. Inasmuch as jurisdiction is not in dispute, we need not further relate the nature and character of petitioner's business.

Upon a charge preferred by one William Hallworth in his individual capacity, respondent issued its complaint against petitioner on May 5, 1942, alleging that petitioner had and was engaging in unfair

892

labor practices within the meaning of Sec. 8(1) and (2) of the Act, by dominating and interfering with the administration of a labor organization of its employes known as the Employes Representation Plan (called the Plan), and dominating and interfering with the formation and administration of another labor organization of its employes known as the Utility Employes Union (called U. E. U.), and by contributing financial and other support to these organizations.

Petitioner, respondent and the U. E. U. participated in a hearing had before a Trial Examiner. The sole witness offered by respondent at such hearing was one Russell H. Golightly,[1] a sub-station operator, who had participated in the affairs of the Plan and who was one of the active organizers of the U. E. U. Respondent by its decision, in conformity with the report of its Trial Examiner, found petitioner guilty of the unfair labor practices charged.

The Plan was conceived and established by petitioner in 1921 for the stated purpose of providing "a definite channel through which the employes individually or collectively, and either personally or through representatives, may take up with the management for discussion and recognition, questions in reference to rates of pay, hours, conditions of work, or any other subject of interest to them as employes." Its constitution was prepared at a convention called by petitioner and attended by an equal number of employe and management representatives. The Plan formally went into operation upon ratification of the constitution by the employe body in an election by secret ballot, and its approval by petitioner's Board of Directors. There appears no occasion to relate the numerous provisions of the Plan or its mode of operation, as petitioner concedes its invalidity and the propriety of the Board's order as it relates thereto.

■ We are of the view that no good purpose could be served by a detailed review of the evidence upon which the Board relies in support of its findings and conclusion that petitioner dominated and interfered with the formation and administration of the U. E. U., and that it furnished financial and other support thereto. We have carefully studied the record and have no hesitancy in stating that the Board's findings in this respect are without substantial support. Further, we are convinced that the evidence definitely refutes the same. We shall, therefore, briefly refer to some of the facts which require this conclusion.

It may be pertinent to observe that U. E. U. had its inception in 1937, following the decisions of the Supreme Court upholding the constitutionality of the Act, and that those, or some of those, including Golightly, who had been employe representatives under the Plan, were active in the formation of the U. E. U. The Board strongly stresses this circumstance, together with the fact that the constitution of the U. E. U. was in many respects similar to that of the Plan. The reliance which is placed upon these circumstances, however, is without significance, in the absence of proof that the employer was in some manner responsible for what occurred. There is no such proof, and, moreover, the management was, by the constitution of U. E. U., stripped of every vestige of control. The fact is, undisputed, that U. E. U. requested petitioner to disestablish the Plan, and contended that its recognition thereof constituted an unfair labor practice. This, petitioner refused to do. The record affirmatively shows that petitioner's employes were so well satisfied with the workings of the Plan that organizers of the U. E. U. had difficulty in persuading them to abandon the Plan, even in the face of its illegality. The highest membership attained by U. E. U. was about 2000, out of a total employment of about 8000. It is also pertinent to observe that the record is barren of any evidence that any affiliated Union had organized or attempted to organize any of petitioner's employes. The rivalry was solely between the U. E. U., which sought to organize a bargaining agent which would conform to the provisions of the Act, and the Plan, whose members, or at any rate a large portion thereof, desired to maintain the status quo.

There is not a scintilla of proof that petitioner in any way, shape or form, by

---

[1] Golightly was employed by petitioner in 1929. Prior to that time, he had been employed in a coal mine in southern Illinois and was a member of the United Mine Workers of America and also of the American Federation of Musicians. After his employment by petitioner, he took a pre-legal as well as a legal course at Chicago night schools and was admitted to the Illinois Bar in October 1935.

word or deed, assisted or supported the organization of the U. E. U. or its administration thereafter. It is a patent contradiction of purpose to impute to petitioner assistance and support for the U. E. U. and at the same time charge it with maintaining the outlawed Plan, which constituted the chief obstacle in the way of a successful organization of the U. E. U. A number of cases are cited which have sustained the Board in finding a labor organization to be company dominated, which is an outgrowth or a substitution for a prior illegal organization of the same character. Without analyzing such cases, it is sufficient to state that none of them involves a factual situation such as now presented. Generally, there was an outside Union involved, against which there had been discrimination or at least hostility, or there was some provision in the constitution of the organization under attack which retained to management some control over its affairs.

The Board also stresses a finding to the effect that a number of employes, classified as management, were members of U. E. U. Such employes, however, occupy a very inconsequential position in the affairs of management. Moreover, the unfairness of the Board's finding is demonstrated in a fashion which deprives it of all support and significance. Prior to the commencement of the hearing, Golightly, as secretary of the U. E. U., turned its books over to counsel for the Board. From such books, exhibits 34 and 35 were prepared and introduced in evidence. The former exhibit contains a list of ten names, and after each name appears the designation "Supervisor." The latter exhibit contains a list of forty-eight names, and after each name appears the designation "Management." Golightly, however, as a Board witness testified that all of these men at the time they joined the U. E. U. were ordinary employes, that they were from time to time promoted or transferred to other work, largely in the cable and engineering departments, and that such promotion or transfer was noted by him on the Union books as "Management" or "Supervisor." He further testified that upon such promotion or transfer they ceased to be members of the Union and no longer paid dues. This explanation by the Board's own witness, not mentioned by it either in its brief before this Court or in its decision, completely destroys any unfavorable inference which otherwise might attach to the Board's finding.

Respondent advances another argument to the effect that authority was lodged with the petitioner to make final decision as to who could speak for U. E. U. This argument is premised upon a provision limiting eligibility of employe representatives to nonsupervisory employes in certain designated voting units, who have had one year's continuous service with petitioner. With the power to transfer, promote or discharge employes, it follows, according to the Board's theory, that petitioner has the power to terminate the representative capacity of an employe. We think this circumstance is of no importance. If we understand the Board's contention, it would apply with equal force to all Unions, affiliated and otherwise, whose bargaining representatives were selected from among the employes. In such cases, the employer would always have control of the Union. He could either change the status of an employe representative by promotion or could sever his relationship with the company by discharge. The only Union which would be safe, according to this theory, would be an affiliated Union whose representatives were composed of persons other than employes. Furthermore, we are unable to perceive how petitioner retained control in the manner relied upon. When an employe representative was promoted or discharged, some other employe would be selected or designated to take his place. Also, the discharge or transfer of an employe who had been designated as an employe representative for any ulterior purpose, would in itself constitute an unfair labor practice.

The Board also places reliance upon certain statements made by Mr. Bradley, an attorney for petitioner, at a conference with a committee of employes prior to any organizational activity on behalf of U. E. U. This conference was had at the request of the employes, and a stenographic report was made of all that was said. A transcript of this report, under the designation of exhibit 21, was offered in evidence by the Board. It covers 38 pages of the Appendix. The statements quoted by the Board are, of course, removed from the context of what was said at an extremely lengthy conference. They were made largely in response to inquiries made by members of the employes' committee. Standing alone, we doubt if any unfavorable inference can be drawn from them, but any doubt in this respect is completely dispelled

894

by a reading of all that was said at this conference. It constituted a frank, fair and honest discussion of the employes' rights as fixed by the Act and petitioner's attitude with reference to the same.

We also desire to mention the testimony of the Board's witness, Golightly, which occupies 134 pages of the Appendix. Again the Board stresses a few statements made by this witness and ignores all the remainder of his testimony, which, when taken as a whole, completely exonerates petitioner of any domination, interference with or support to the U. E. U. In this connection, it is at least interesting to note that so far as the record discloses only one employe, Hallworth, out of some 8000, was interested in the institution or the prosecution of this case. It is also interesting to note that although the charge was preferred by him and the record discloses his presence at the hearing before the Trial Examiner, he was not called as a witness.

We now consider the Board's order directed against petitioner and "its * * * successors and assigns." The words "successors and assigns" are improperly included, as we have previously decided. N. L. R. B. v. Bachelder, 7 Cir., 125 F.2d 387; N. L. R. B. v. Stone, 7 Cir., 125 F.2d 752; N. L. R. B. v. Cleveland-Cliffs Iron Co., 6 Cir., 133 F.2d 295. Paragraph 1(a), (b) and (c) contain the cease and desist provisions of the order. Paragraphs (a) and (b) are in the usual form, the former requiring petitioner to cease and desist from dominating and interfering with the administration of Employes Representation Plan and Utility Employes Union, the latter from recognizing those two organizations as the representative of any of its employes for the purpose of collective bargaining. In view of what we have heretofore said, these two paragraphs are properly directed at the Employes Representation Plan but improperly directed at Utility Employes Union,[2] and the latter will be eliminated from the order.

The main attack on the cease and desist order is directed at paragraph 1(c),

which provides: "In any other manner interfering with, restraining, or coercing its employees in the exercise of the right of self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in concerted activities for the purposes of collective bargaining or other mutual aid or protection, as guaranteed in Section 7 of the Act." This is the precise language of the Board's order which was held illegal in N. L. R. B. v. Express Publishing Company, 312 U.S. 426, 61 S.Ct. 693, 699, 85 L.Ed. 930. Both petitioner and respondent contend that this case supports their respective positions with reference to this paragraph. Notwithstanding what appears to be the plain holding in the Express case, there exists considerable contrariety of opinion among Courts as to its meaning and scope.

There can be no question but that paragraph 1(c) is all inclusive; that is, it covers every kind and character of an unfair labor practice defined by the Act. So much was conceded by counsel for the Board in oral argument before this Court. The only unfair labor practice of which petitioner now stands convicted is the domination and interference with the formation and administration of the Plan, in violation of Sec. 8(2) of the Act, which automatically becomes a violation of Sec. 8(1). In the Express case, the unfair labor practice of which the employer was found guilty was the refusal to bargain, in violation of Sec. 8(5) of the Act, which, like all other unfair practices designated by the Act, was also a violation of Sec. 8(1). The Court, in holding the order invalid, said: "But the mere fact that a court has found that a defendant has committed an act in violation of a statute does not justify an injunction broadly to obey the statute and thus subject the defendant to contempt proceedings if he shall at any time in the future commit some new violation unlike and unrelated to that with which he was originally charged. This Court will strike from an injunction decree restraints upon the commission of unlawful acts which are thus dissociated

---

[2] It developed at the hearing before this Court that the attorney for U.E.U. had notified the Board, long subsequent to the entry of the order under review, to the effect that at a general meeting of the membership of the U.E.U. it was voted by those present that the U.E.U. be voluntarily disestablished, and that by reason of such action the organization had ceased to exist. We are of the view that this action is immaterial to any question now before us. Even though material, however, it is doubtful if we have any right to consider it. "The case must be heard on the record as certified by the Board." N.L.R.B. v. Newport News Co., 308 U.S. 241, 250, 60 S.Ct. 203, 208, 84 L.Ed. 219.

from those which a defendant has committed." It is our opinion that petitioner's domination and interference with a labor organization, in violation of 8(2) of the Act, is just as much unrelated to other unfair practices defined in the Act as was the company's refusal to bargain, in violation of 8(5) of the Act in the Express Company case.

It is true that in the Express case the Court on page 434 of 312 U.S., on page 699 of 61 S.Ct., 85 L.Ed. 930, stated: "The Board made no finding and there is nothing in the record to suggest that the failure of the bargaining negotiations and all that attended them gave any indication that in the future respondent would engage in all or any of the numerous other unfair labor practices defined by the Act." Evidently relying upon this statement, the Board in the instant case found: "The respondent's unlawful course of conduct discloses a purpose to defeat self-organization and its objects. Because of such conduct and its underlying purpose, we find that the unfair labor practices in which the respondent has engaged are persuasively related to the other unfair labor practices prescribed by the Act and that the danger of their commission in the future 'is to be anticipated from the course of the respondent's conduct in the past.'"

In view of what has heretofore been said, we are unable to perceive how this finding can be sustained. There was no proof of any hostility by petitioner toward organized labor and no discrimination of any kind or character against any employe other than that arising from its domination of the Plan. There was no proof of a refusal to bargain with the employes of an appropriate unit and no representative of the employes claimed such right.

It appears to us that under such circumstances petitioner should not be placed in the same position as an employer who has been a notorious violator of the Act; yet that is precisely its position if paragraph 1(c) is enforced. As was said in the Express case, 312 U.S. on page 437, 61 S.Ct. on page 700, 85 L.Ed 930: "To justify an order restraining other violations it must appear that they bear some resemblance to that which the employer has committed or that danger of their commission in the future is to be anticipated from the course of his conduct in the past." How a discrimination in regard to hire or tenure, a discrimination because an employe has filed charges or given testimony under the Act, or a discrimination by refusal to recognize or bargain with employes of an appropriate unit, bear any resemblance to petitioner's violation in the instant case, or why the commission of such discriminations in the future is to be anticipated from petitioner's conduct in this case, we are unable to comprehend. We conclude that paragraph (c) is improper and that it should be eliminated from the order.

Paragraph 2(a), (b) and (c) contain the affirmative requirements of the order. These provisions must be altered to conform to what we have held relative to the cease and desist portion of the order. The Board's request for enforcement of its order as presented is denied. Enforcement of an order in conformity with the views herein expressed is allowed.