735 A.2d 633

POLLUTION CONTROL FINANCING AUTHORITY OF WARREN COUNTY, PLAINTIFF–APPELLANT,[1] v. COUNTY OF SOMERSET, BOARD OF CHOSEN FREEHOLDERS OF SOMERSET

---

[1] There were two third-party complaints filed (by County of Somerset, Board of Chosen Freeholders, and Richard E. Williams; and by Bridgewater Resources, Inc.), and a fourth-party defendant named, but these claims settled prior to the judgment appealed here, and are not part of this appeal. The two cases were administratively consolidated in the trial court.

COUNTY, AND BRIDGEWATER RESOURCES, INC., DEFEN-
DANTS–RESPONDENTS, AND RICHARD E. WILLIAMS,
SOMERSET COUNTY ADMINISTRATOR, DEFENDANT.

---

WARREN ENERGY RESOURCE CO., L.P., PLAINTIFF–APPEL-
LANT, v. COUNTY OF SOMERSET, BOARD OF CHOSEN
FREEHOLDERS OF SOMERSET COUNTY, AND BRIDGEWA-
TER RESOURCES, INC., DEFENDANTS–RESPONDENTS, AND
RICHARD E. WILLIAMS, SOMERSET COUNTY ADMINISTRA-
TOR, DEFENDANT (TWO CASES).

---

POLLUTION CONTROL FINANCING AUTHORITY OF WARREN
COUNTY, PLAINTIFF–RESPONDENT, v. COUNTY OF SOMER-
SET, BOARD OF CHOSEN FREEHOLDERS OF SOMERSET
COUNTY, AND BRIDGEWATER RESOURCES, INC., DEFEN-
DANTS–RESPONDENTS, AND RICHARD E. WILLIAMS, SOM-
ERSET COUNTY ADMINISTRATOR, DEFENDANT.

Superior Court of New Jersey
Appellate Division

Argued April 20, 1999—Decided August 27, 1999.

Before Judges BROCHIN, KLEINER and STEINBERG.

*Michael J. Perrucci,* argued the cause for Pollution Control Financing Authority of Warren County, appellant in A–5679–97T1 and respondent in A–5927–97T1 *(Florio & Perrucci,* attorneys; *Edward J. Boccher,* of counsel and on the brief; *Lisa Barre–Quick* and *Eric J. Ascalon,* on the brief).

*Arthur S. Goldstein,* argued the cause for respondent, County of Somerset *(Wolff & Samson,* attorneys; *Mr. Goldstein* and *Stephen H. Bier,* on the brief).

*Michael R. O'Donnell,* argued the cause for Warren Energy Resource Company, L.P., appellant in A–5927–97T1 and respondent in A–5679–97T1 *(Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Edward A. Zunz, Jr.,* and *Edward K. DeHope,* of counsel; *Mr. O'Donnell, Deborah J. Sokol,* and *Andrew Kogan,* on the brief).

*Stephen Schnitzer,* argued the cause for respondent Bridgewater Resources, Inc.

Respondent Board of Chosen Freeholders of Somerset County, did not participate in oral argument or file a brief.

Amicus Curiae, First Union National Bank in A–5679–97T1, did not participate in oral argument *(Riker, Danzig, Scherer, Hyland & Perretti,* attorneys; *Dennis J. O'Grady,* of counsel; *Joseph L. Schwartz,* on the brief).

The opinion of the court was delivered by

BROCHIN, J.A.D.

Plaintiff Pollution Control Financing Authority of Warren County (PCFA) is an agency established by Warren County pursuant to the New Jersey Pollution Control Financing Law, *N.J.S.A.* 40:37C–1 to –18. PCFA financed, arranged for the construction of, and now owns a waste incinerator and landfill in Warren County, New Jersey. Plaintiff Warren Energy Resource Co. (WERC) is a private corporation which operates the incinerator under contract with PCFA. Defendant Bridgewater Resources, Inc. (BRI) is a licensed operator of a solid waste transfer station

and a waste hauler which delivered Somerset County solid waste to the PCFA incinerator. PCFA and WERC appeal from a final judgment entered May 27, 1998, which incorporates prior orders for summary judgment and an order denying reconsideration. These orders were entered in favor of Somerset County and BRI relieving those defendants from any further obligation to deliver solid waste to the PCFA incinerator or pay for failing to deliver it.

By an "Interdistrict Agreement" dated January 17, 1990, between PCFA and Somerset County, Somerset County promised to cause 1,400 tons a week of solid waste generated within the county to be delivered to PFCA's incinerator and to pay for the processing of that quantity of solid waste, whether delivered or not. The summary judgment in favor of Somerset County declares that this agreement is "void and unenforceable as a matter of law" and that Somerset County is excused from its further performance as of November 10, 1997.

BRI was not a party to the 1990 Interdistrict Agreement, although it was a party to 1992 and 1994 [2] supplements to that agreement. Those supplements provided for the delivery of additional quantities of solid waste in excess of 1,400 tons a week to the PCFA incinerator to make up for failures to satisfy the delivery quota during prior years. The parties have disagreed about whether those supplements made BRI a party to the 1990 agreement. But whether or not BRI was a party to the interdistrict agreement, it was subject to the Somerset County solid waste management plan, reflected in DEP regulation *N.J.A.C.* 7:26–6.5(s)(3) (repealed), because BRI was a regulated waste hauler and transfer station operator. The terms of that regulation obligated it to transport "[u]p to 1,400 tons per week of processible solid waste generated within Somerset County ... from the Bridgewater Resources, Inc. Transfer Station to the Warren County Resource Recovery Facility...." The order for summary

---

[2] Although this supplement names BRI as a party to the agreement, it is not signed by anyone on behalf of BRI.

judgment entered in favor of BRI declares that BRI "has no further obligation to deliver waste" to PCFA and WERC. The final judgment also makes it clear that BRI is not liable for failure to comply with the provision of an agreement for partial settlement which declares that a prior court order requiring BRI to continue delivery of solid waste "will remain in effect unless and until vacated or modified by the Court," and the court declined to hold BRI in contempt of the subsequently vacated order.

The orders for summary judgment which are the subject of this appeal are based on the Commerce Clause jurisprudence enunciated by the United States Supreme Court in *C & A Carbone, Inc. v. Town of Clarkstown,* 511 *U.S.* 383, 114 *S.Ct.* 1677, 128 *L.Ed.*2d 399 (1994) (*"Carbone"*). The Third Circuit Court of Appeals interpreted *Carbone* and applied it to the New Jersey solid waste management system in *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 48 *F.*3d 701 (3d Cir.1995) (*"Atlantic Coast I"*), and *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 112 *F.*3d 652 (3d Cir.1997) (*"Atlantic Coast II"*), *cert. denied,* —— *U.S.* ——, 118 *S.Ct.* 412, 413, 139 *L.Ed.*2d 316 (1997), *amended,* 135 *F.*3d 891 (3d Cir.1998). The United States District Court for the District of New Jersey interpreted and applied the *Atlantic Coast* cases in *Union County Utilities Authority v. Bergen County Utilities Authority,* 995 *F.Supp.* 506 (D.N.J.1998). In order to explain our decision in the present case, we need to review the opinions in those cases.

These are the facts of *Carbone.* Pursuant to a consent decree entered into by the town of Clarkstown and the New York State Department of Environmental Conservation, Clarkstown agreed to close its landfill and to build a new solid waste transfer station on the site that had been occupied by the landfill. The transfer station would receive bulk solid waste and would separate recyclable from non-recyclable waste. Non-recyclable waste would be shipped from the transfer station to a landfill or incinerator. A local contractor agreed to construct the transfer station, to oper-

ate it for five years, and then to sell it to the town for one dollar. The contractor would recover the costs of construction and operation of the transfer station by charging a "tipping fee" of $81 a ton to be paid by haulers of delivered waste. To ensure that the contractor would collect tipping fees sufficient to pay the costs they were planned to cover, the town guaranteed that 120,000 tons a year of solid waste would be delivered to the transfer station. To implement that guaranty, the town adopted a "flow control" ordinance which required all solid waste collected within the town to be taken to that particular transfer station. Refuse collectors other than the town's contractor could collect waste within the town, but they had to deliver it to that transfer station and to pay the $81 a ton tipping fee, even though their waste was already sorted, and they were prohibited from shipping waste out of the town. Carbone, a refuse collector that had a competing transfer station in the municipality, challenged the flow control ordinance.

The Supreme Court held that Clarkstown's flow control ordinance burdened interstate commerce and impeded its free flow. However, "[t]he real question," according to the Court, was "whether the flow control ordinance is valid despite its undoubted effect on interstate commerce," 511 *U.S.* at 389, 114 *S.Ct.* at 1682, 128 *L.Ed.*2d at 407, either because "the ordinance discriminates against interstate commerce [citing *City of Philadelphia v. New Jersey,* 437 *U.S.* 617, 624, 98 *S.Ct.* 2531, 2535, 57 *L.Ed.*2d 475, 481–82 (1978) ]" or because it "imposes a burden on interstate commerce that is 'clearly excessive in relation to the putative local benefits' [citing *Pike v. Bruce Church, Inc.,* 397 *U.S.* 137, 142, 90 *S.Ct.* 844, 847, 25 *L.Ed.*2d 174, 178 (1970) ]." 511 *U.S.* at 390, 114 *S.Ct.* at 1682, 128 *L.Ed.*2d at 407. The Court ruled that, like any other law that sought to permit only local processors to process locally produced materials, the ordinance discriminated against interstate commerce because it "allows only the favored operator to process waste that is within the limits of the town." *Ibid.* Such "[d]iscrimination against interstate commerce in favor of local business or investment is *per se* invalid, save in a narrow class of cases in which the municipality can demonstrate, under

rigorous scrutiny, that it has no other means to advance a legitimate local interest." *Id.* at 392, 114 *S.Ct.* at 1683, 128 *L.Ed.*2d at 409. The Clarkstown ordinance was invalid because it did not fall within that limited exception. Rejecting a justification for the ordinance that is particularly pertinent to the present case, the Court said:

> The flow control ordinance does serve a central purpose that a nonprotectionist regulation would not: It ensures that the town-sponsored facility will be profitable, so that the local contractor can build it and Clarkstown can buy it back at nominal cost in five years. In other words, as the most candid of amici and even Clarkstown admit, the flow control ordinance is a financing measure. By itself, of course, revenue generation is not a local interest that can justify discrimination against interstate commerce. Otherwise States could impose discriminatory taxes against solid waste originating outside the State.
>
> Clarkstown maintains that special financing is necessary to ensure the long-term survival of the designated facility. If so, the town may subsidize the facility through general taxes or municipal bonds. But having elected to use the open market to earn revenues for its project, the town may not employ discriminatory regulation to give that project an advantage over rival businesses from out of State.
>
> [*Id.* at 393–94, 114 *S.Ct.* at 1684, 128 *L.Ed.*2d at 410 (citations omitted).]

Atlantic Coast was a Pennsylvania waste hauler and transfer station operator. It accepted construction and demolition debris at its transfer station in Philadelphia, separated out the recyclable materials, which amounted to less than twenty percent of the total by weight, and shipped the residue to various landfills for disposal. It sought to obtain access to construction and demolition debris generated in New Jersey, but it was unsuccessful in having its transfer station included as an authorized facility in any New Jersey district waste management plan. Since New Jersey's waste management regulations required shipping all non-recyclable solid waste collected in New Jersey to the transfer stations designated for the districts from which the waste had been taken, Atlantic Coast's only course consistent with New Jersey law would have been to return non-recyclable waste to the designated facilities for processing or to pay a compensating fee.

Rejecting those expedients as too costly, Atlantic Coast commenced an action in the United States District Court for the District of New Jersey challenging the constitutionality of New

Jersey's solid waste flow control regulations. The Atlantic County and Camden County Boards of Chosen Freeholders, the Atlantic County Utilities Authority, the Pollution Control Financing Authority of Camden County, and the Commissioner of the New Jersey Department of Environmental Protection and Energy were named as defendants. *Atlantic Coast I, supra,* 48 *F.*3d at 709 n. 13. Atlantic Coast sought, among other things, a declaration that New Jersey's solid waste flow control regulations were unconstitutional and a permanent injunction barring the defendants from prohibiting or interfering with the transportation of construction and demolition debris at any point from its generation or collection within New Jersey to its shipment to facilities outside the State.

The district court, whose first opinion in the case preceded the United States Supreme Court's *Carbone* decision, ruled against Atlantic Coast. Atlantic Coast appealed.[3] According to the Third Circuit, the "fundamental issue" presented by the appeal was "whether the district court erred in concluding that the New Jersey regulatory waste flow scheme does not violate the dormant Commerce Clause." *Id.* at 709. In order to decide that issue, the court described and analyzed the New Jersey regulatory scheme in detail. The following excerpts from that description and analysis are particularly pertinent to the case now before us:

> As an integral part of the district plan and utility regulation system, the Department and waste districts are authorized under the [Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to –207] and [Solid Waste Utility Control Act, *N.J.S.A.* 48:13A–1 to –13] to direct the flow of waste to designated facilities. N.J. Stat. Ann. § 48:13A4(c) (West Supp.1994); Op. N.J. Att'y Gen. No. 3 (1980)....
>
> . . . .
>
> [A]s the district court found:

---

[3] On appeal, Hudson County Improvement Authority, Passaic County Utilities Authority, Essex County Utilities Authority, Mercer County Improvement Authority, Cape May County Municipal Utilities Authority, and the Pennsylvania Department of Environmental Resources participated as amici curiae in support of the constitutionality of New Jersey's solid waste management system. Jersey City, the Borough of Northvale, C & A Carbone, Inc., and various trade groups participated as amici curiae in support of the opposite position.

> Although it is not the subject of a clear legislative direction [sic], it is equally clear that the D.E.P.E. administers the law [the Solid Waste Management Act and the Solid Waste Utility Control Act] with the specific goal that all waste generated in New Jersey be disposed of within the borders of the state. The 1993 solid waste management state plan update, which was admitted into evidence and herein referred to as the *Update*, provides: "As a key policy objective, New Jersey will continue to move toward achievement of self-sufficiency in disposal capacity. The Department's objective is to eliminate reliance on out-of-state disposal within a seven-year period."
>
> Accordingly, a waste district that is unable to identify sufficient existing waste facilities or suitable sites within the district, or within another district pursuant to an interdistrict agreement, to meet the district's waste needs must certify to the Department the absence of suitable in-district sites and the failure to reach an interdistrict agreement. *See* N.J. Stat. Ann. § 13:1E–21 (West 1991). Only after such a certification, can a waste district plan that designates an out-of-state disposal site receive Department approval. *In re Long–Term Out–of–State Waste Disposal Agreement Between County of Hunterdon & Glendon Energy Commission*, 237 *N.J.Super.* 516, 568 *A.2d* 547, 551–53 (Ct.App.Div.) [sic], *certif. denied*, 121 *N.J.* 647, 583 *A.2d* 337 (1990). Thus, the designation process is intended to favor operators that have facilities already located within, or those that are willing to construct a facility within, the state.
>
> [*Id.* at 706–708 (footnote omitted).]

Applying the *Carbone* decision to the New Jersey solid waste management system, the Court of Appeals concluded, "New Jersey's flow control regulations accomplish on a district level substantially what Clarkstown's flow control ordinance accomplished on a local level." *Id.* at 712. The New Jersey system is illegal, the court held, because "New Jersey is regulating the market for solid waste processing and disposal services in each of the districts by directing district consumers of those services to utilize a favored service provider who, in the absence of exceptional circumstances, operates a local facility," *id.* at 713, thus discriminating against interstate commerce even though there is no absolute bar to the utilization of out-of-state disposal facilities. In support of that conclusion, the court noted that the New Jersey Department of Environmental Protection and Energy "acknowledges that it approves district plans only if they are consistent with the 'core' goal of having all of New Jersey's solid waste processed and disposed of in New Jersey within the next five years." *Ibid.* That goal, the court observed, "can be accomplished, and is being accomplished, only by selecting existing and proposed in-state

facilities whenever possible." *Ibid.* Consequently, "out-of-state facilities do not compete on anything approaching a level playing field [citing *Wyoming v. Oklahoma,* 502 *U.S.* 437, 455, 112 *S.Ct.* 789, 801, 117 *L.Ed.*2d 1, 23 (1992) ]." *Ibid.*

The Court of Appeals remanded the *Atlantic Coast* case to the district court for a determination whether this discrimination against interstate commerce could survive the "strict scrutiny" test which the Supreme Court held was applicable. *Id.* at 717 (quoting *Maine v. Taylor,* 477 *U.S.* 131, 138, 106 *S.Ct.* 2440, 2447, 91 *L.Ed.*2d 110, 120–21 (1986)). Following a trial on remand, the district court held that "the defendants have failed to meet their burden of demonstrating that the local purpose behind flow control could not be served as well by available nondiscriminatory means." *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County,* 931 *F.Supp.* 341, 343 (D.N.J.1996). The district court permanently enjoined the enforcement of New Jersey's waste flow regulations, but stayed the effect of the injunction to permit the State to develop alternative arrangements for the management of solid waste. *Ibid.*

The case was again appealed to the Third Circuit. *Atlantic Coast II,* 112 *F.*3d 652 (3d Cir.1997). Referring to *Waste Management of Pennsylvania, Inc. v. Shinn,* 938 *F.Supp.* 1243 (D.N.J. 1996), "for a discussion of the trials and tribulations of New Jersey waste authorities that have contracted with out-of-state facilities," the Circuit Court observed that under the current waste management regime, "out-of-state facilities have rarely been authorized to dispose of New Jersey's solid waste." *Id.* at 657. The Circuit Court quoted with approval the district court's statement that " 'Although it is not the subject of a clear legislative direction [sic], it is equally clear that [NJDEP] administers the law with the specific goal that all waste generated in New Jersey be disposed of within the borders of the state.' " *Id.* at 658. The court reiterated the conclusion of *Atlantic Coast I* that "[t]he imposition of this self-sufficiency policy on the selection of waste disposal facilities has resulted in the discrimination against out-of-state

processors...." *Ibid.* Having summarized the controls on disposing of solid waste in unauthorized sites and the penalties for violating them, the court concluded:

> Taken as a whole, the waste disposal laws present substantial barriers to out-of-state firms wishing to collect, transport, and process any of the waste generated within New Jersey. The State is able to enforce this regulatory system through its impressive array of rules, regulations, fines and other penalties.
>
> [*Id.* at 659.]

The Circuit Court rejected the argument that the district court "should have severed the State's purpose of self-sufficiency from our consideration of the statute in *Atlantic Coast I* and should have then reviewed the flow control laws and the individual waste disposal plans of the twenty-two waste disposal districts separately to determine whether they were still discriminatory." *Id.* at 662. The Circuit Court said:

> We affirm the district court's decision because our determination in *Atlantic Coast I* that New Jersey's flow control laws discriminated against interstate commerce was based not just on New Jersey's stated goal to create a self-sufficient in-state waste disposal program. It was also based on the management districts' selection of facilities and the codification of this selection by state regulation.... In New Jersey, ... state policy had precluded ... open competition and the list of facilities designated in *N.J.A.C.* § 7:26–6.5 reflects that policy. As a result of this discriminatory policy, the flow control regulations, through § 7:26–6.5, have limited the facilities that can accept waste generated in a particular district to those so designated in the regulation.
>
> . . . .
>
> Our finding of discriminatory purpose and effect in *Atlantic Coast I* ... applied both to the waste management district's choice of a facility to service its needs and to the State's approval of that choice.
>
> [*Id.* at 662–63.]

The court enjoined the State from enforcing *N.J.A.C.* 7:26–6.5, the regulation which requires "[u]p to 1,400 tons per week of processible solid waste generated within Somerset County [to] be transported from the Bridgewater Resources, Inc. Transfer Station to the Warren County Resource Recovery Facility...." *Id.* at 680. The court declared:

> Pursuant to the effect of the injunction, the disposal facilities presently listed there can no longer be considered the facilities to which each district's solid waste must be directed. The waste management districts must modify their plans to select new disposal facilities pursuant to *N.J.A.C.* §§ 7:26–6.6 and 6.7.

[*Id.* at 668.]

An order amending the court's opinion adds:

> By the same token, we do not, of course, express a view on any issue not before us. If, for example, there be entities not before us who claim rights under contractual arrangements that they maintain are not the product of the discrimination here challenged, those alleged rights are beyond the scope of our adjudication.
>
> [*Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County*, 135 F.3d 891, 891 (3d Cir.1998).]

The Bergen County Utilities Authority ("BCUA") was one of the defendants in the *Atlantic Coast* case. *See Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders of Atlantic County*, 988 *F.Supp.* 486, 487 (D.N.J.1997). Prior to November 10, 1997, the effective date of the *Atlantic Coast II* injunction, BCUA had entered into a long term contract to dispose of its solid waste at a facility operated by the Union County Utilities Authority ("UCUA"). A suit between BCUA and UCUA was pending in State court to determine the continuing validity of their contract after *Atlantic Coast II*. On the application of BCUA, the New Jersey Federal District Court exercised its authority under the Federal Anti–Injunction Act, 28 *U.S.C.A.* § 2283 and the All Writs Act, 28 *U.S.C.A.* § 1651, and assumed jurisdiction over the suit in order to decide the effect of the *Atlantic Coast II* injunction and the possible modification of its terms. *Id.* at 488.

The interdistrict solid waste disposal agreement between BCUA and UCUA, as described by the district court in *Union County Utilities Authority v. Bergen County Utilities Authority*, 995 *F.Supp.* 506, 508–09 (D.N.J.1998), is similar in some respects to the agreement between PCFA and Somerset County, which is the subject of the present appeal. In 1987, UCUA contracted with Ogden Martin Systems of Union, Inc. to have Ogden construct the Union County Resource Recovery Facility and operate it for twenty years. UCUA agreed to deliver a guaranteed annual tonnage of solid waste to the facility and to pay for the agreed tonnage, whether delivered or not. To share the cost of constructing and operating the facility, UCUA entered into a long term

contract with BCUA by which BCUA agreed to deliver 192,000 tons of Bergen County processible waste to the facility during each year or make compensating monthly payments if the quota was not met.

The court ruled that the *Atlantic Coast II* injunction "prohibits the enforcement of executory waste delivery provisions of any contract entered into through a negotiation process that prohibited out-of-state competition." The court designated these as "Impacted Old Law Contracts." *Id.* at 508. But it did not explicitly decide whether the BCUA–UCUA agreement was one of those Impacted Old Law Contracts. As a conclusion to its opinion, the court stated:

> [W]e hold that the *Atlantic Coast II* injunction prohibits the NJDEP from approving any solid waste management plan containing an Impacted Old Law Contract. We also hold that the injunction prohibits state courts from specifically enforcing the executory waste delivery provisions of an Impacted Old Law Contract. Such provisions are retroactively void. Whether or not any other provisions remain enforceable is an issue best determined by state courts. We also find that state courts are best equipped to fashion equitable remedies which, where appropriate, allocate the economic burdens created by *Atlantic Coast II*. Therefore, we will deny BCUA's application requesting us to vacate Judge Boyle's temporary restraining order. We will also deny UCUA's application for a preliminary injunction. Because there remain no federal issues for us to decide, we will remand this matter to the Union County Superior Court for further adjudication by Judge Boyle.
>
> [*Id.* at 520.]

The case was remanded to State court to determine on the basis of State law "[w]hether or not (1) the remaining provisions of any contract are enforceable or (2) either party may be entitled to a monetary award of damages...." *Id.* at 508.

That completes our description of the legal context in which summary judgment was entered in favor of defendants Somerset County and BRI, relieving them from any further obligation to deliver solid waste to the PCFA incinerator or to pay for failing to deliver it. We turn now to the rationale for the summary judgment itself.

The summary judgment court rejected PFCA's arguments that genuinely disputed issues of material fact precluded the entry of

summary judgment. The court concluded that the provisions of
the disputed Interdistrict Agreement requiring Somerset County
to deliver specified quantities of solid waste to the PCFA facility
or pay the processing rate then in effect for any shortfall "echoed
the requirements already set forth in *N.J.A.C.* 7:26–6.5(s)(2) and
(3);" that New Jersey's discriminatory policies which required
Somerset either to build its own facility or enter into a contract
with Warren County "were the ONLY factor in [sic] why the
parties entered into the agreement;" that the selection process
which led to formation of the Interdistrict Agreement was discrim-
inatory as a matter of law; and that the parties would not have
entered into it but for New Jersey's unconstitutional flow control
requirements because satisfying those requirements was its only
business purpose.

WERC argued that there were material issues of fact whether
Somerset County and BRI were capable of performing their
responsibilities under the Interdistrict Agreement by constitution-
al means, whether defendants assumed the risk of the *Atlantic
Coast II* ruling, and whether they had made adequate attempts to
reduce the impediments to performance which that ruling created.
The court rejected these arguments also. It ruled that the issues
raised by WERC were relevant only to the question whether
defendants were entitled to be excused from performance under
the Uncontrollable Circumstances clause of the Interdistrict
Agreement. It held that that question was immaterial because
the Interdistrict Agreement was, "by definition, an Impacted Old
Law Contract," that is, "it was negotiated in an environment that
did not allow competition from out-of-state entities," and the
contract was therefore unenforceable as a matter of law.

The court explained its rationale as follows:

The negotiations which led to the formation of the Interdistrict Agreement here did
not begin until after 1987. It is clear that Somerset had revised its waste
management plan prior to completing the negotiations and that revised plan
obviously had a big impact on the outcome of the Interdistrict Agreement itself.
New Jersey's self-sufficiency policies had already been in effect for quite some time
when each of these events took place.... [I]n reading the Interdistrict Agree-
ment, it is quite clear that the parties relied heavily on what had already been

codified as *N.J.A.C.* 7:26–6.5(s) [the unconstitutional waste flow regulations requiring Somerset to deliver a specified quantity of waste to the PCFA facility].

Finding that the principal purpose of the Interdistrict Agreement was to provide for the delivery of solid waste in accordance with the unconstitutional flow regulations, the court declined to accept the Federal District Court's suggestion to explore state law equitable doctrines in order to accomplish an equitable sharing of the financial burdens that will result from termination of the Interdistrict Agreement.

In a subsequent opinion disposing of plaintiffs' motions for reconsideration and for relief in aid of litigants' rights, the motion court rejected defendants' contention that BRI had breached a July 30, 1997 agreement for partial settlement and, because of that breach, should be required to pay damages for failing to deliver 1,400 tons of waste a week between December 5, 1997, and April 20, 1998. The court explained that

the settlement agreement did not create an independent obligation on BRI to deliver waste unless and until the February 21 Order [requiring BRI to deliver no less than 1,400 tons of waste each week to PCFA and WERC] is modified and/or vacated. Rather, the court finds that BRI agreed to continue all obligations under the February 21 Order, absent the provisions modified, unless and until it is modified and/or vacated.

On that basis, the court denied plaintiffs' applications to find BRI in violation of the settlement agreement.

On appeal from these rulings, plaintiff PCFA argues that material facts in dispute should have prevented the motion court from granting summary judgment voiding the Interdistrict Agreement, and that the court misinterpreted or misapplied the governing law as set forth in *Union County Utilities Authority v. Bergen County Utilities Authority,* 995 *F.Supp.* 506 (D.N.J.1998). Plaintiff WERC argues that the grant of summary judgment was premature; that the failure to join Warren County as a party to the litigation prevents adjudication of the validity of the Interdistrict Agreement; and that BRI is liable for damages because it breached the July 30, 1997 settlement agreement and violated the court's February 21, 1997 order requiring BRI to deliver no less than 1,400 tons of waste per week to the PCFA facility. Alterna-

tively, WERC argues that the motion court erred in failing to exercise its equitable powers to fashion a remedy which would fairly allocate the consequences of abrogating the Interdistrict Agreement.

The only federal court decisions which constitute binding precedent for state courts are decisions of the United States Supreme Court. *Dewey v. R.J. Reynolds Tobacco Co.*, 121 *N.J.* 69, 79, 577 *A.*2d 1239 (1990). We are convinced, however, that the decisions of the Third Circuit Court of Appeals in the *Atlantic Coast* cases and of the New Jersey Federal District Court in the *Union County Utilities Authority* case have correctly interpreted the holding and implications of the Supreme Court's opinion in *Carbone*. The essential holding of those cases is that New Jersey's solid waste flow control regulations which were in effect when the Interdistrict Agreement was entered into are void and unenforceable because, without adequate justification, they concededly discriminated against out-of-state haulers and waste disposal facilities. Those regulations are unconstitutional because their effect was to coerce waste management districts to contract primarily with in-state disposal facilities in order to comply with State policy. In the language of *Atlantic Coast I, supra,* 48 *F.*3d at 713, New Jersey's flow control regulations deprived out-of-state facilities of the opportunity to compete on "a level playing field."

There is no way to discern whether the same facility that won a solid waste disposal contract on a tilted field would have prevailed if the game had been played on level ground. The only way to avoid perpetuating the fruits of illegality is to replay the game. To restate the same proposition in more prosaic terms, the Interdistrict Agreement between PCFA and Somerset County was entered into under conditions which improperly favored in-state competitors. Removing the illegal burden on interstate commerce requires abrogating the executory provisions of the Interdistrict Agreement in order to free Somerset County to deal with out-of-state waste processors if it chooses to do so. That was the holding of the motion court when it entered its order for summary

judgment in favor of Somerset County. That order is therefore affirmed.

■ *Atlantic Coast II, supra,* 112 *F.*3d at 667, expressly held that the State's solid waste flow control regulations, which required BRI to deliver waste to the PCFA facility, were unconstitutional and therefore unenforceable against BRI or anyone else. If BRI became a party to the Interdistrict Agreement, that Interdistrict Agreement is unenforceable against BRI for the same reasons that it is unenforceable against Somerset County. As to the July 30, 1997 settlement agreement, we agree with the motion court that that agreement did not purport to impose any new delivery obligation on BRI; it merely confirmed that a prior court order requiring deliveries by BRI would remain in effect "unless or until vacated or modified by the Court." That prior order was vacated or modified in obedience to the federal court decisions invalidating the flow control regulations that were the source of BRI's delivery obligations. We therefore affirm both the court's refusal to hold BRI in contempt for failure to deliver solid waste in compliance with its prior order, *see In re Allegations of Violations of Law & Administrative Code by A. Fiore & Sons, Inc.,* 305 *N.J.Super.* 192, 701 *A.*2d 1303 (App.Div.1997), *aff'd,* 158 *N.J.* 105, 726 *A.*2d 1289 (1999), and the summary judgment holding that BRI is under no obligation to deliver or pay damages for failure to deliver solid waste to the PCFA facility.

WERC's alternative argument, that "[t]he interests of equity and justice ... dictate that ... all parties to the Interdistrict Agreement and Settlement Agreement, including Somerset and BRI, be required to share responsibility for the burdens imposed by Atlantic Coast II," was presented to the motion court. But because Warren County was not before the court and PCFA and WERC were concentrating their efforts on seeking to enforce the Interdistrict Agreement, no one focused their arguments on seeking an equitable allocation of the financial burdens that will result from vacating it. Now that we have concluded that the orders for summary judgement were properly entered abrogating the agree-

ment, justice requires that we seek a fair allocation of those burdens.

Unless some equitable relief is awarded in favor of PFCA, the financial burden of operating the resource recovery facility and of servicing and amortizing the bonds issued to pay for its construction will weigh disproportionately on the taxpayers of Warren County. That does not seem equitable. It is true, as Somerset County argues, that Warren County had already built the resource recovery facility when Somerset County entered into the Interdistrict Agreement. Nonetheless, Somerset benefitted from the Interdistrict Agreement. In the legal climate that prevailed from January 17, 1990, when the Interdistrict Agreement was signed, until November 10, 1997, when the flow control regulations became invalid, Somerset County would almost certainly have had to build its own disposal facility if it was unable to enter into an agreement with a neighboring county. Disposing of solid waste according to the Interdistrict Agreement was surely less costly than building a facility and also saved Somerset County from the political and environmental burdens of siting a waste incinerator.

These are some of the considerations which suggest that some allocation of the present burden would be equitable. The Federal District Court's opinion in *Union County Utilities Authority v. Bergen County Utilities Authority* catalogs some of the legal and equitable doctrines that authorize fashioning a remedy which accomplishes an equitable allocation of the burden. However, neither the factual record nor the legal arguments presented to us provide us with sufficient criteria for formulating a proper remedy. A remand for that purpose is therefore required.

Lastly, we consider WERC's argument that Warren County is an indispensable party and that a judgment should not have been entered in its absence. As a party to the Interdistrict Agreement and a guarantor of the bonds issued by PCFA, the County would, of course, have been a proper party. However, with respect to all of the issues that were before the motion court except for the issue of a remedy which will equitably allocate the

burden among the parties, we agree with the court that Warren County has been adequately represented by PCFA, the agency which it created to implement its solid waste management plan, and by WERC, the operator of its resource recovery facility.

But with respect to the equitable allocation of the financial burden, Warren County has unique interests of its own which are not adequately represented by either of the present plaintiffs. The remedy ultimately ordered may affect Warren County's cost of waste disposal and its liability on its guarantee of PFCA's bonds. We therefore direct that Warren County be joined as a party on remand, either as a plaintiff if it chooses to intervene or as a defendant if it declines to do so.

Any arguments which we have not dealt with explicitly have either been adequately disposed of in the several opinions of the motion court or are not of sufficient merit to warrant discussion in this opinion.

The judgment appealed from is affirmed in part and reversed in part. The case is remanded to the trial court for further proceedings not inconsistent with this opinion.