755 A.2d 637

BOROUGH OF PRINCETON, A MUNICIPAL CORPORATION, PLAINTIFF–APPELLANT, v. BOARD OF CHOSEN FREE-HOLDERS OF THE COUNTY OF MERCER AND MERCER COUNTY IMPROVEMENT AUTHORITY, DEFENDANTS–RE-SPONDENTS,WASTE MANAGEMENT OF PENNSYLVANIA, INC., DEFENDANT/INTERVENOR-RESPONDENT.

IN THE MATTER OF CERTAIN AMENDMENTS TO THE ADOPTED AND APPROVED SOLID WASTE MAN-AGEMENT PLAN OF MERCER COUNTY.

BOROUGH OF PRINCETON, A MUNICIPAL CORPORATION, PLAINTIFF–RESPONDENT, v. BOARD OF CHOSEN FREE-HOLDERS OF MERCER COUNTY AND MERCER COUNTY IMPROVEMENT AUTHORITY, DEFENDANTS,WASTE MAN-AGEMENT OF PENNSYLVANIA, INC. DEFENDANT/INTER-VENOR-APPELLANT.

IN THE MATTER OF THE ADOPTION AND APPROVAL OF AN ADMINISTRATIVE ACTION CONCERNING THE MORRIS COUNTY DISTRICT SOLID WASTE MANAGEMENT PLAN.

AMERICAN REF–FUEL COMPANY OF ESSEX COUNTY, PLAIN-TIFF–APPELLANT, v. MORRIS COUNTY MUNICIPAL UTILI-TIES AUTHORITY AND WASTE MANAGEMENT OF PENN-SYLVANIA, INC., DEFENDANTS–RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued December 15, 1999—Decided July 31, 2000.

312

Before Judges STERN, WEFING and STEINBERG.

*Lewis Goldshore,* argued the cause for Borough of Princeton, appellant in A–2291–97T3 and A–2343–97T2; respondent in A–2776–97T3 (*Goldshore & Wolf,* attorneys; *Mary S. Henifin* and *Robert J. Cash,* of counsel and on the brief).

*Michael R. Cole,* argued the cause for Mercer County Board of Chosen Freeholders and Mercer County Improvement Authority, respondents in A–2291–97T3 and A–2343–97T2 (*DeCotiis, Fitzpatrick & Gluck,* attorneys for Mercer County Improvement Authority; *Alfred B. Vuocolo, Jr.,* Mercer County Counsel, attorney for Mercer County Board of Chosen Freeholders; *Mr. Cole,* of counsel; *Andrew Bayer,* on the brief in A–2291–97T3; and *Mr. Bayer* and *Cecelia Haney,* on the brief in A–2343–97T2).

*Sandra T. Ayres,* argued the cause for Waste Management of Pennsylvania, Inc., appellant in A–2776–97T3; respondent in A–2291–97T3, A–2343–97T2, A–1704–98T3 and A–3291–97T3 (*Schwartz, Tobia, Stanziale, Becker, Rosensweig & Sedita,* attorneys; *Ms. Ayres,* on the brief).

*Leslie Dannin Rosenthal,* Deputy Attorney General, argued the cause for Department of Environmental Protection, respondent in A–2343–97T2 and A–3291–97T3 (*John J. Farmer, Jr.,* Attorney General, attorney; *Andrea M. Silkowitz,* Assistant Attorney General, of counsel; *Ms. Rosenthal,* on the brief).

*Ross A. Lewin,* argued the cause for American Ref–Fuel Company of Essex County, appellants in A–3291–97T3 and A–1704–

98T3 (*Jamieson, Moore, Peskin & Spicer,* attorneys; *Mr. Lewin,* of counsel; *Mr. Lewin* and *David G. Glazer,* on the brief).

*Joseph J. Maraziti, Jr.,* argued the cause for Morris County Municipal Utilities Authority, respondent in A–3291–97T3 and A–1704–98T3 (*Maraziti, Falcon & Healey,* attorneys; *Mr. Maraziti, Jr.,* of counsel; *Todd L. Normane* and *Brent T. Carney,* on the brief).

The opinion of the court was delivered by

WEFING, J.A.D.

These five appeals were argued together before us on December 15, 1999. They involve related issues concerning solid waste disposal and we therefore consolidate them for purposes of this opinion. Two of the matters arise out of Morris County, three from Mercer County. The two Morris County matters are A–3291–97 and A–1704–98. In A–3291–97, *In re Adoption and Approval of an Administrative Action Concerning the Morris County District Solid Waste Management Plan,* American Ref–Fuel Co. of Essex County (American Ref–Fuel) appeals from a final decision of the New Jersey Department of Environmental Protection (DEP). In A–1704–98, *American Ref–Fuel Co. v. Morris County Municipal Utilities Authority,* American Ref–Fuel appeals from the trial court's grant of summary judgment to defendants Morris County Municipal Utilities Authority (Morris County) and Waste Management of Pennsylvania, Inc. (Waste Management).

The three Mercer County matters are A–2291–97, A–2776–97 and A–2343–97. A–2291–97, *Borough of Princeton v. Board of Chosen Freeholders,* began as a challenge in lieu of prerogative writs by the Borough of Princeton (Princeton) to an amendment to Mercer County's solid waste management plan; it was transferred to this court by the trial court under *R.* 2:2–3(a)(2). In A–2776–97, *Borough of Princeton v. Board of Chosen Freeholders,* Waste Management appeals a trial court order permitting Princeton to amend the prerogative writs complaint at issue in A–2291–97.

Finally, in A–2343–97, *In re Certain Amendments to the Adopted and Approved Solid Waste Management Plan,* Princeton appeals from a final decision of the DEP approving certain amendments to Mercer County's solid waste management plan.

## I

Before turning to the factual complexes and merits of the individual appeals, it is necessary to set forth some background so that the particular arguments asserted may be understood and analyzed in the proper context. Commencing in 1970, New Jersey undertook to adopt and implement a comprehensive system to regulate and control the disposal of solid waste within the State. New Jersey Solid Waste Management Act, *N.J.S.A.* 13:1E–1 to – 207; Solid Waste Utility Control Act, *N.J.S.A.* 48:13A–1 to –13. One of the underlying goals of the structure New Jersey put in place was that the State would be self-sufficient in terms of solid waste disposal. Thus, if any of the State's twenty-two solid waste districts wanted to utilize an out-of-state facility to dispose of its solid waste, it had to obtain the approval of the DEP to do so. One condition of such DEP approval was a certification that no suitable site was available in that solid waste management district. *N.J.S.A.* 13:1E–21(b)(3). The background of the regulatory development is set forth in *Waste Management of Pa., Inc. v. Shinn,* 938 *F.Supp.* 1243, 1246–47 (D.N.J.1996).

Much of this State's solid waste management control was eventually struck down as unconstitutional under the dormant commerce clause to the United States Constitution and the State was enjoined from enforcing its restrictions against the disposal of solid waste outside the confines of a solid waste district. *Atlantic Coast Demolition & Recycling, Inc. v. Board of Chosen Freeholders,* 112 *F.*3d 652, 667 (3d Cir.), *cert. denied,* 522 *U.S.* 966, 118 *S.Ct.* 413, 139 *L.Ed.*2d 316 (1997), *amended,* 135 *F.*3d 891 (3d Cir.1998) (*Atlantic Coast II* ). Since that decision, parties across the State have struggled to deal with its consequences. *IMO Passaic County Utils. Auth.,* 164 *N.J.* 270, 753 *A.*2d 661 (2000);

*Pollution Control Fin. Auth. v. County of Somerset,* 324 *N.J.Super.* 391, 735 *A.*2d 633 (App.Div.1999); *Camden County Energy Recovery Assocs. v. New Jersey Dept of Envtl. Protection,* 320 *N.J.Super.* 59, 726 *A.*2d 968 (App.Div.1999).

Prior to *Atlantic Coast II,* both Mercer County and Morris County sought to achieve long-term stability in meeting their responsibilities for solid waste disposal by entering into agreements with Waste Management.[1]

In 1988, Mercer County and Waste Management[2] executed an agreement under which Waste Management granted Mercer County "all rights, title and interest in an irrevocable non-exclusive license which shall run with the land." That "license" gave Mercer County the right, over a twenty-five year period, to dispose of 4.5 million tons of solid waste in a Pennsylvania landfill owned and controlled by Waste Management. In return for this license, Mercer made a down payment of $30 million. It also agreed to pay monthly "service fee purchase payments," which were computed on the basis of tonnage received at the landfill, together with operation and maintenance costs.

In 1993, Morris County and Waste Management executed a contract under which the County, in exchange for a $1 million down payment and monthly "deferred purchase payments," ob-

---

[1] We are cognizant of the fact that these two counties acted through independent authorities to achieve their goals, Mercer County through the Mercer County Improvement Authority and Morris County through the Morris County Municipal Utilities Authority. Thus, the Counties and the authorities have appeared in these appeals through their own counsel. The statutory distinctions between such entities (Municipal and County Utilities Authorities Law, *N.J.S.A.* 40:14B–1 to –78; County Improvement Authorities Law, *N.J.S.A.* 40:37A–1 to – 135) are irrelevant for the purposes of these appeals, however, and for ease of understanding, we shall refer throughout the course of this opinion only to Mercer County or Morris County.

[2] Similarly, certain of the agreements at issue involved corporations that were either subsidiary to, or affiliated with, Waste Management of Pennsylvania, Inc. For ease of understanding, we shall refer throughout this opinion only to Waste Management.

tained "all rights, title and interest to an undivided interest in the Premises owned by [Waste Management], consisting of the acquisition of certain easement rights ... which rights shall run with the land." The "easement" created under this agreement gave Morris County the right to deposit 4.5 million tons of solid waste in a Pennsylvania landfill owned and controlled by Waste Management, over a ten year period, as well as an option to extend the agreement for an additional five years. The monthly "deferred purchase payments" were computed on the basis of tonnage received at the landfill and a specified "unit charge." The cost per ton varied according to the nature of the waste deposited, i.e., whether it was characterized as municipal waste, bulky waste, baled waste or industrial waste or residue.

While each set of appeals involves questions particular to that county, the core issue projected in all the appeals is the validity of the purported Mercer County "license" agreement and the Morris County "easement" agreement. Princeton challenges the Mercer contract, while American Ref–Fuel contests the Morris agreement; both assert that the respective agreements should be struck down for violating the provisions of the Local Public Contracts Law, *N.J.S.A.* 40A:11–1 to –50.

At the time these agreements were initially entered into, this statute required that all contracts "for the performance of any work or the furnishing or hiring of materials or supplies" that called for the expenditure of more than $7,500 in public funds had to be publicly advertised for bidding. *N.J.S.A.* 40A:11–3 and –4. (The threshold amount has subsequently been increased to $17,500. In light of the size and scope of these contracts, that amendment is immaterial to our analysis.) While the statute further requires that the contract be awarded to the lowest responsible bidder, *N.J.S.A.* 40A:11–6.1, it also exempts certain transactions from the bidding process entirely, including purchases of real property or any interest therein, *N.J.S.A.* 40A:11–2(4), contracts for professional services, *N.J.S.A.* 40A:11–5(1)(a)(i), and contracts for the marketing of recyclable materials. *N.J.S.A.*

40A:11–5(1)(s). Finally, the statute limits the period a public contract may run. *N.J.S.A.* 40A:11–15(3) restricts contracts for the collection and disposal of municipal solid waste to a term not exceeding five years.

## II

We turn now to the factual background particular to the two Morris County appeals. In 1992, Morris County published a Request for Proposals, under which it sought to acquire an "easement" in a landfill to provide for the disposal of 4.5 million tons of solid waste. At the time Morris County solicited proposals for this easement, it was contemplating constructing its own in-county resource recovery facility to comply with DEP's policy of self-sufficiency, and it thus referred to an easement for a ten-year period, with a five-year option to renew. Morris County received five responding proposals and eventually selected Waste Management's as "most advantageous" for the county.

One of the other entities that had submitted a competing proposal, Empire Sanitary Landfill, Inc. (Empire), commenced an action in lieu of prerogative writs that challenged the award to Waste Management. In January 1993, the trial court denied Empire's request for temporary injunctive relief. It gave an oral opinion in which it applied the principles governing applications for temporary injunctive relief, under *Crowe v. De Gioia*, 90 *N.J.* 126, 447 *A.*2d 173 (1982), and concluded that Empire had not demonstrated a likelihood of success on the merits because, in the view of the trial court, the transaction was not subject to the Local Public Contracts Law, even though it conceded that characterizing the transaction as an interest in real estate was "a somewhat artificial analysis." No appeal was taken from that determination and shortly after the denial of injunctive relief, the parties agreed to dismiss the matter with prejudice.

On January 6, 1993, Morris County and Waste Management executed an agreement titled "Agreement for the Acquisition of an Undivided Interest in Real Property, Consisting of the Acquisition

of Certain Easement Rights Relating Thereto." We are informed the agreement was thereafter duly recorded. Morris County then adopted implementing amendments to its solid waste management plan and sought DEP approval. Approval was finally obtained in December 1994, conditioned on Morris County amending its plan to provide for long-term use of in-state waste disposal facilities.

In the interim, however, before DEP approval had been obtained, Morris County executed a Memorandum of Understanding with Essex County, under which Morris agreed to deliver to the Essex County Resource Recovery Facility the lesser of all acceptable waste generated in Morris County or 225,000 tons. The Essex County Resource Recovery Facility is owned and operated by American Ref–Fuel. Waste Management promptly filed suit, alleging that the Memorandum of Understanding with Essex County violated the terms of its easement agreement with Morris County. The trial court ruled that there was no breach of the easement agreement, as long as Morris transported to Waste Management's Pennsylvania facility the residue remaining after incineration.

After the *Atlantic Coast II* decision struck down New Jersey's attempt to mandate exclusively in-state disposal of solid waste, Morris County amended its solid waste management plan to restate its existing disposal strategy of utilizing its "easement" at Waste Management's Pennsylvania site. This was approved by the DEP on January 9, 1998 and, in February 1998, American Ref–Fuel appealed to this court from that final administrative approval. That appeal is before us as A–3291–97.

Additionally, in April 1998, American Ref–Fuel began an action in lieu of prerogative writs in which it challenged the 1993 easement agreement between Morris County and Waste Management as being in violation of the Local Public Contracts Law. The trial court (the same court that had heard Empire's request for temporary injunctive relief some five years earlier) granted summary judgment to defendants. The trial court concluded that although it was still of the view that the transaction was not

subject to the Local Public Contracts Law, it was "less confident" of that analysis now than previously. Nonetheless, the trial court concluded the challenge was untimely and that it would be fundamentally unfair to permit someone to attempt to undo what had been in place for five years. American Ref–Fuel appealed from that grant of summary judgment; that appeal is before us as A–1704–98.

## III

We turn now to the factual background particular to the three Mercer County appeals. In the wake of *Atlantic Coast II,* Mercer County, as did Morris County, adopted an amendment to its solid waste management plan, a portion of which relied upon the county's 1988 license agreement with Waste Management for disposal of solid waste. It did, however, in 1997, prior to requesting and obtaining DEP approval of this plan amendment, negotiate an amendment to the 1988 license agreement with Waste Management, which reduced its term from twenty-five years to twenty years and adjusted the formula for computing the cost.

In September 1997, Princeton filed a complaint in lieu of prerogative writs in which it challenged Mercer County's 1997 amendment to its solid waste management plan; it included within its challenge the 1997 amendment Mercer County had negotiated to its 1988 license agreement. After hearing argument on defendants' motion to dismiss, the trial court concluded that the matter should be transferred to this court. Princeton's challenge to Mercer County's 1997 amendment to its solid waste management plan is the subject of A–2291–97.

Prior to the actual transfer, however, Princeton filed a motion to amend its complaint to include an allegation that the license agreement was invalid under the Local Public Contracts Law. The trial court granted that motion. In A–2776–97, Waste Management argues that the trial court erred in permitting that amendment.

Finally, in December 1997, Princeton filed a separate appeal from the final action of the DEP approving Mercer County's amendment to its solid waste management plan. That is the subject of A–2343–97.

## IV

■ The first issue we must address is the timeliness of these challenges. Morris County, Mercer County and Waste Management all maintain that American Ref–Fuel and Princeton should be time-barred from seeking to overturn the 1988 and 1993 license and easement agreements. If we were to agree that American Ref–Fuel and Princeton are simply too late in presenting their arguments, we would not have to reach the substantive merits of their contentions.

We are satisfied, however, that it would be inappropriate to refuse to entertain these challenges on such a ground. We reach that conclusion for several reasons.

Two of the appeals before us, A–1704–98 and A–2291–97, began in the Law Division as actions in lieu of prerogative writs under R. 4:69 and, pursuant to R. 4:69–6(a), such actions generally have to be commenced within forty-five days "after the accrual of the right to the review, hearing or relief claimed. . . ." R. 4:69–6(c), however, provides that time period may be enlarged, "where it is manifest that the interest of justice so requires." We are entirely satisfied that the "interest of justice" calls for enlargement in these matters.

We cannot, for instance, disregard this State's long history of concern about the possibilities of abuse in the solid waste industry. *In re Application of Saddle River*, 71 *N.J.* 14, 22, 362 *A.*2d 552 (1976). Nor can it be doubted that "the activity of collecting and disposing of solid waste is affected with a public interest". *Id.* at 20, 362 *A.*2d 552. That is no less true now than it was nearly thirty years ago. The public interest, in our view, would not be served by invoking a rigid deadline beyond which the expenditure

of millions of public dollars over an extended period of years would be immune from judicial scrutiny.

We are also satisfied that consideration of the 1997 and 1998 amendments to the solid waste plans cannot be separated, in any analytically sound way, from consideration of the earlier agreements upon which they are premised. Review of the one question ineluctably leads to review of the second.

We recognize, as did the trial court in Morris County, that considerations of fairness to the parties and stability in public affairs should not be disregarded. In our judgment, however, those factors are more appropriately considered during the process of crafting a remedy, should that prove necessary, rather than serve to bar examination of the underlying issue completely.

It is not without some significance, moreover, that two of the appeals before us are timely challenges to DEP approvals of solid waste plans that are fundamentally bottomed on these agreements. It serves no purpose, to our mind, to refuse to entertain the issue in some appeals as untimely and yet address the same issue in other appeals before us.

Further, we cannot close our eyes to the impact of *Atlantic Coast II,* upon the State, its citizens and the regulated community, and the fact that it has left in its wake "an unanticipated statewide solid waste financial crisis." *IMO Passaic County Utils. Auth., supra,* 164 *N.J.* at 304, 753 *A.2d* 661. Although our disposition of these appeals does not directly require us to address that financial crisis, there is no doubt that these challenges arise now in light of the changed legal and economic landscape wrought by *Atlantic Coast II.* As American Ref-Fuel notes, prior to *Atlantic Coast II,* it could not have solicited solid waste from Mercer County or Morris County, absent an inter-district agreement between either county and Essex County that had the approval of the DEP.

We have not hesitated in other matters involving solid waste disposal to enlarge the time within which suit must be brought when important public questions are involved. *Ironbound Comm.*

v. *Board of Chosen Freeholders,* 230 *N.J.Super.* 133, 553 *A.*2d 30 (App.Div.), *certif. denied,* 117 *N.J.* 64, 563 *A.*2d 828 (1989). A similar analysis should apply here. These appeals project important public questions and involve expenditure of significant sums of public money. Other counties, moreover, have attempted to negotiate similar agreements. *See, e.g., Waste Management of Pa., Inc., supra,* 938 *F.Supp.* at 1247–49. We conclude that these challenges cannot be rejected for reasons of timeliness.

## V

### A.

We thus take up the question whether these agreements are invalid for failure to comply with the requirements of the Local Public Contracts Law. The Counties and Waste Management all maintain that the agreements, by creating an easement, an interest in real property, are exempt from the Local Public Contracts Law. We are unable to agree.

An easement is a "nonpossessory incorporeal interest in another's possessory estate in land, entitling the holder of the easement to make some use of the other's property." *Mandia v. Applegate,* 310 *N.J.Super.* 435, 442–43, 708 *A.*2d 1211 (App.Div. 1998). "Easements may ... be created for a fixed term or for the accomplishment of a specific purpose." *Eggleston v. Fox,* 96 *N.J.Super.* 142, 147, 232 *A.*2d 670 (App.Div.1967). No particular words are necessary to constitute the grant of an easement; any words which clearly show the intention to give an easement are sufficient to effect that purpose, provided the language is certain and definite in its terms. *Camp Clearwater, Inc. v. Plock,* 52 *N.J.Super.* 583, 596, 146 *A.*2d 527 (Ch.Div.1958), *aff'd* 59 *N.J.Super.* 1, 157 *A.*2d 15 (App.Div.1959), *certif. denied,* 32 *N.J.* 348, 160 *A.*2d 846 (1960).

Because the parties' claim to an easement arises from their respective written agreements, we must analyze those agreements to determine if they indeed contain the elements of an

easement and reflect an intent to create an easement. In undertaking that analysis, we are guided by the general principles governing judicial interpretation of a contract. The court's goal is to ascertain the "intention of the parties to the contract as revealed by the language used, taken as an entirety ..., the situation of the parties, the attendant circumstances, and the objects they were thereby striving to attain." *Cruz–Mendez v. ISU/Insurance Servs.*, 156 *N.J.* 556, 570–71, 722 *A.*2d 515 (1999). The polestar of contract construction is to discover the intention of the parties as revealed by the language used by them. *Jacobs v. Great Pac. Century Corp.*, 104 *N.J.* 580, 518 *A.*2d 223 (1986); *Casriel v. King*, 2 *N.J.* 45, 65 *A.*2d 514 (1949). The interpretation, moreover, should "accord with justice and common sense." *Krosnowski v. Krosnowski*, 22 *N.J.* 376, 387, 126 *A.*2d 182 (1956).

The document, moreover, must be read as a whole, without artificial emphasis on one section, with a consequent disregard for others. Literalism must give way to context. *Schenck v. HJI Assocs.*, 295 *N.J.Super.* 445, 452–53, 685 *A.*2d 481 (App.Div.1996), *certif. denied* 149 *N.J.* 35, 692 *A.*2d 48 (1997). "In construing a contract, a court must not focus on an isolated phrase but should read the contract as a whole as well as considering the surrounding circumstances." *Wheatly v. Sook Suh*, 217 *N.J.Super.* 233, 239, 525 *A.*2d 340 (App.Div.1987). Having reviewed these documents, in light of those principles, we are satisfied that their entire thrust, apart from using the terminology "easement" and providing for their recordation, is that of a contract for solid waste services.

The contract between Morris County and Waste Management is illustrative. Under Article II, which purports to create the easement, Morris County is obligated to deliver to the landfill "all Acceptable Waste which is generated within ... the County and which is ... disposed of ... outside of ... the County ...", Section 2.1(c), and to comply with Waste Management's rules and regulations for "customers," Section 2.5(b). The contract thus not only purports to convey an easement to the County but it also

imposes affirmative duties upon the County. Indeed, it goes further and specifies that the County's failure to deliver "all Acceptable Waste" in accordance with Section 2.1(c) is an event of default which would entitle Waste Management to specific performance. Section 8.5(e); Section 8.6(a).

The agreement also imposes certain continuing affirmative obligations upon Waste Management, including construction and expansion of its facilities, if needed, to accept the balance of the County's waste and to maintain "the necessary manpower, equipment and capital." Section 5.1(e).

The agreement uses the term "deferred purchase payments" to describe the regular monthly payments the County is obligated to make for depositing its waste at Waste Management's landfill. The price per ton varies, however, depending upon the nature of the waste deposited. Section 4.3(a)(1), (2), (3), (4); Section 4.3(b)(1), (2).

■ Certain portions of the agreement, moreover, reflect the parties' recognition that in casting their arrangement as an easement, they were entering an uncertain area. The agreement provides, for instance, that if the terms of the agreement are, at any time, construed to require the County to be approved as a landfill owner or operator, the agreement will terminate. Section 2.5(d). Easements, however, generally do not terminate prematurely as the result of the actions of unrelated third parties; rather, they can be protected from the acts of third parties. *Kearny v. Municipal Sanitary Landfill Auth.,* 143 *N.J.Super.* 449, 459, 363 *A.*2d 390 (Law Div.1976).

That Morris County and Waste Management were entering a contract for solid waste disposal is also illustrated by the Request for Proposals prepared and published by Morris County in 1992. The County described its objective in seeking such an "easement" in the following manner:

The acquisition of the Easement by the Authority is intended to provide a reliable solution to the solid waste disposal needs of the County in a cost-effective and environmentally secure manner.

The only geographic requirement specified for the location of the "easement" was that it be located outside the boundaries of the County.

The County included in its Request for Proposals a description of the criteria it would utilize to evaluate the responses it received:

> The objective of the Authority in seeking responses to the Request for Proposals is to enable it to select the Proposal that provides the most complete, dependable, cost effective, environmentally sound Landfill for the processing and disposal of the Solid Waste generated within the County. Emphasis will be placed on evaluating the long and short-term economic impacts of the Proposal. . . .

We have similarly reviewed in detail the terms of Mercer County's 1988 agreement with Waste Management and note at the outset that we attribute no significance to the agreement's use of the term "license" as opposed to "easement." We focus on the over all substance of the agreement instead. "Disproportionate emphasis upon a word or clause or a single provision does not serve the purpose of interpretation." *Newark Publishers' Ass'n v. Newark Typographical Union,* 22 *N.J.* 419, 426, 126 *A.*2d 348 (1956). Although this earlier Mercer County agreement may lack certain of the provisions we have delineated from the Morris County agreement, their absence does not detract from our fundamental judgment that both contracts are, in essence, contracts for the disposal of solid waste, rather than easements and do not create an interest in real property. *N.J.S.A.* 40A:11-2(4). We note, for instance, that the Mercer County agreement provided that failure by the County to deliver to Waste Management the agreed-upon amounts of waste would be an event of default, Section 7.5, and that the monthly "service fee purchase payments" varied according to the nature of the waste deposited, Section 3.3(a), (b), (c) and (d).

In our judgment, the conclusion is inescapable that the counties were envisioning contracts for solid waste disposal and that they entered contracts for solid waste disposal, albeit clothed in different raiment. We must recognize the substance of the contracts, and not be diverted by terminology. We are satisfied that neither the agreement between Morris County and Waste Management,

nor the agreement between Mercer County and Waste Management, creates an easement such as would exempt the transactions from the requirements of the Local Public Contracts Law.

New Jersey has a long tradition of requiring open and free competitive bidding for public contracts, *Terminal Constr. Corp. v. Atlantic County Sewerage Auth.*, 67 *N.J.* 403, 341 *A.*2d 327 (1975); *Hillside v. Sternin*, 25 *N.J.* 317, 136 *A.*2d 265 (1957). According to the Supreme Court, public bidding is "deeply embedded in the public policy of this State." *N.E.R.I. Corp. v. New Jersey Highway Auth.*, 147 *N.J.* 223, 236, 686 *A.*2d 328 (1996). Public bidding statutes exist for the benefit of the taxpayers and should be construed solely with reference to the public good. *National Waste Recycling, Inc. v. Middlesex County Improvement Auth.*, 150 *N.J.* 209, 695 *A.*2d 1381 (1997). We have consistently required that contracts for the collection and disposal of solid waste be awarded through public bidding. *Ibid.; Meadowbrook Carting Co. v. Borough of Island Heights*, 138 *N.J.* 307, 313, 650 *A.*2d 748 (1994); *Fereday & Meyer Co. v. Board of Public Works*, 27 *N.J.* 218, 142 *A.*2d 99 (1958). In addition, as we noted earlier, New Jersey has long been sensitive to the problems that have continued to plague the solid waste industry. *National Waste Recycling, Inc., supra*, 150 *N.J.* at 220–22, 695 *A.*2d 1381; *In re Application of Saddle River, supra*, 71 *N.J.* at 22, 362 *A.*2d 552. The Legislature was not acting in a vacuum when it enacted that portion of the Local Public Contracts Law forbidding any contract for the collection and disposal of municipal solid waste for a period longer than five years. *N.J.S.A.* 40A:11–15(3).

In our judgment, it would run counter to those expressed public policies to permit parties, by the simple expedient of calling a solid waste disposal contract an "easement," to escape the scrutiny and examination inherent in the public bidding process, and to deprive the taxpayers of the benefits of public bidding. We cannot disregard the Supreme Court's recent reminder of the "continued necessity for competitive bidding and for strict judicial construction of the LPCL [Local Public Contracts Law] as applied to solid

waste...." *National Waste Recycling, Inc., supra,* 150 *N.J.* at 222, 695 *A.*2d 1381.

It is immaterial, to our mind, that there has been no showing of favoritism or impropriety in connection with the negotiation of these contracts, or that they may have been motivated by a desire to assure that adjoining states could not preclude the deposit of New Jersey solid waste in their landfills. More than forty years ago, Justice Francis wrote "In this field it is better to leave the door tightly closed than to permit it to be ajar...." *Sternin, supra,* 25 *N.J.* at 326, 136 *A.*2d 265. Time has not diminished the wisdom of that philosophy, particularly when the parties seek, not to leave the door slightly ajar, but rather, to fling it fully open to all.

Further, the contention that these arrangements should not be subject to the Local Public Contracts Law because of their complexity is, in our view, not a satisfactory response. It is an argument more properly addressed to the Legislature, which is free to agree with that assessment and exempt such transactions from public bidding, if it chooses. It has not done so to date, however, and we must analyze the issues in terms of the statute as it presently reads.

 Finally, before concluding our discussion of the applicability of the Local Public Contracts Law, we note that we disagree with the assertions that these contracts should be considered "hybrid" in nature, combining some features subject to public bidding requirements and others that are not. *Autolote Ltd. v. New Jersey Sports and Exposition Auth.,* 85 *N.J.* 363, 427 *A.*2d 55 (1981); *Nachtigall v. New Jersey Turnpike Auth.,* 302 *N.J.Super.* 123, 694 *A.*2d 1057 (App.Div.), *certif. denied,* 151 *N.J.* 77, 697 *A.*2d 549 (1997). While we do not disparage the effort required of Waste Management to comply with various regulatory requirements to provide waste disposal services in a scientifically and environmentally sound manner, there can be analogy between those services and the services involved in designing and installing an integrated electronic toll collection system for our State's toll

roads, bridges and tunnels, *Nachtigall, supra,* 302 *N.J.Super.* at 127, 694 *A.*2d 1057.

### B.

While we are satisfied that these agreements do not comply with the requirements of the Local Public Contracts Law, we are also satisfied that, for a number of reasons, we should not immediately set them aside and direct a rebidding. First and foremost, we will do nothing that could interfere with the public health and safety; suddenly disrupting a county's established method of disposing of its solid waste does not adequately protect the interests of the affected citizens. Further, we have an inadequate record upon which to determine what remedies may be appropriate in this unique situation. The remaining length of the contracts, the amounts the parties have expended to date in meeting their obligations under these agreements, as well as the anticipated costs or anticipated savings of new agreements, are all factors which must be considered before a final determination can be made as to what relief, if any, would be appropriate. In addition, the parties may be cognizant of other factors that should be considered as well and they should have the opportunity to present their views before a final decision is made and implemented.

We recognize that some may consider it anomalous that we have concluded the agreements are invalid but yet refuse to set them aside immediately. We take our guidance, however, from the approach adopted by the Supreme Court in *National Waste Recycling, supra,* 150 *N.J.* at 231–32, 695 *A.*2d 1381, when, because of its concern about unfairness, it left in place a contract that had not been bid in accordance with the bidding statute. The contract at issue there had only a short time to run; these, however, of course, have an extended future and we do not mean to imply that the parties are entitled to have them remain in place for their entire term. We are of the view, though, that they should remain in place a sufficient time to permit the trial courts

and the parties the opportunity to consider the ramifications of our ruling and structure appropriate responses. We suggest, however, that upon remand, a realistic but firm date be set for the counties to propose a fair method of disengagement. *See, IMO Passaic County Utils. Auth., supra,* 164 *N.J.* at 306, 753 *A.*2d 661.

## VI

We turn to the remaining issues. In A–3291–97, American Ref-Fuel appeals from the DEP's approval of Morris County's amendment to its solid waste management plan. In light of our analysis and our conclusion that the underlying agreement between Morris County and Waste Management is invalid, we consider this appeal moot. We reach a similar result in A–2343–97, in which Princeton appeals the DEP approval of Mercer County's amendment. We do not deem it necessary to address the additional reasons put forth by Princeton to support its challenge to that approval. In A–2776–97, Waste Management argues that the trial court erred when it permitted Princeton to amend its complaint to allege a violation of the Local Public Contracts Law. We consider that argument to be without substantial merit and not warranting discussion in a written opinion. *R.* 2:11–3(e)(1)(E). Finally, A–2291–97, was, in our view, improperly transferred here by the trial court for it is not an appeal from a final decision or action "of any state administrative agency or officer." We thus return the matter to the trial court for further proceedings in accordance with this opinion. We do not address any of the legal issues raised by the parties within that appeal other than what we have already set forth in this opinion, because the trial court never addressed those issues on the merits. We decline to address them in the first instance.

We acknowledge that within that appeal, Princeton challenges the method selected by Mercer County to deal with the stranded debt left in the wake of *Atlantic Coast II.* That question, of course must be revisited in the light of the Supreme Court's

recent decision, *In re Passaic County Utils. Auth., supra,* 164 *N.J.* at 282, 753 *A.*2d 661.

## VII

In sum, we dismiss A–2343–97 and A–3291–97 as moot. In A–2291–97 we vacate the order transferring the matter to this court and remand the matter to the trial court. In A–2276–97, we affirm the order of the trial court permitting amendment of the complaint. In A–1704–98, we reverse the order of the trial court and remand the matter for further proceedings in accordance with this opinion. We do not retain jurisdiction of any of the remanded matters.