**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2314-18T1

EXCEL ENVIRONMENTAL
RESOURCES, INC.,

     Plaintiff-Respondent,

v.

PIOLI PROPERTIES, LLC,

     Defendant-Appellant.

_____

Argued January 22, 2020 – Decided February 21, 2020

Before Judges Yannotti, Hoffman and Firko.

On appeal from the Superior Court of New Jersey, Law Division, Middlesex County, Docket No. L-0445-17.

Matthew Joonho Jeon argued the cause for appellant (Matthew Jeon, PC, attorneys; Matthew Joonho Jeon, on the briefs).

Ronald E. Steinvurzel argued the cause for respondent (Steinvurzel & Levy Law Group, attorneys; Ronald E. Steinvurzel, on the brief).

PER CURIAM

Following a bench trial, defendant Pioli Properties (Pioli) appeals from the Law Division judgment entered in favor of plaintiff Excel Environmental Resources for services performed under two vapor mitigation contracts. We affirm.

I.

We derive the following facts from the trial record. Bristol Meyers Squib (BMS) allegedly caused a release of chlorinated solvents, which dissolved into ground water underneath Pioli's property located on Georges Road in New Brunswick (the property). According to an investigation report completed for BMS, the property required vapor mitigation.

As a result, on August 1, 2014, plaintiff and Pioli entered into a written contract (Contract # 1), whereby plaintiff agreed to design and install a vapor mitigation system for the property at a cost of $78,500.00. Plaintiff invoiced Pioli regularly from December 31, 2014 until June 30, 2016, billing Pioli a total of $79,940.47. Pioli did not pay the amount billed, claiming plaintiff had agreed to seek payment from BMS.

Under the terms and conditions of Contract # 1, plaintiff could "bill for the actual hours expended and costs incurred. . . ." and agreed to "not exceed this cost estimate without advance Authorization/Extension of Services or other acceptable documentation." The contract also stated, "The work outlined in this proposal will

be conducted in accordance with [plaintiff's] Standard Terms and Conditions and labor rates provided as Attachment A." Attachment A stated, in pertinent part:

> This agreement between [plaintiff] and the client identified herein, consisting of a proposal and Standard Terms and Conditions, constitutes the entire understanding between the parties . . . [Plaintiff] hereby objects to any terms contained in any prior or subsequent purchase orders, work orders, invoices, acknowledgment forms, requests for proposals or other documents received from the [c]lient that would otherwise have the effect of modifying or abrogating these Standard Terms and Conditions in whole or in part.

In addition, Attachment A included a provision regarding changes to the contract:

> [Plaintiff] shall be entitled to additional compensation for work in the event that [plaintiff] experiences any increases in costs due to changes in the scope of work defined in [plaintiff's] original proposal, or for additional work requested by client, or changes in the manner or method of performance of work, or due to changes in schedule or circumstances not solely caused by [plaintiff]. [Plaintiff] shall be compensated for all such additional work either (1) as previously agreed in writing by the parties; or (2) on a time and materials basis in accordance with [plaintiff's] then current standard commercial rates.

Attachment A also contained an estimated costs and schedule clause:

> Costs and schedule estimates are based on [plaintiff's] best judgment of the requirements known at the time of the proposal and can be influenced favorably or adversely by

3

[c]lient's needs and other circumstances. [Plaintiff] will endeavor to perform the [s]ervices and accomplish the objectives within the estimated costs and schedule, but in no event shall [plaintiff's] estimate be interpreted as a not-to-exceed or fixed price. . . . [Plaintiff] shall be entitled to a change order for additional compensation or additional time to perform its work, in the event that work outside the [s]ervices is requested or required to be performed by [plaintiff], or in the event that the assumptions underlying [plaintiff's] proposal prove to be different from the facts actually encountered by [plaintiff] during the performance of the [s]ervices.

On June 5, 2015, the parties entered into a second contract (Contract # 2), whereby plaintiff agreed to provide certain remedial investigation services on the property at a cost of $20,955. Contract # 2 stated "it is . . . an extension to [Contract # 1]." On January 19, 2016 and February 26, 2016, Pioli made two payments totaling $15,784.04 for work performed pursuant to Contract # 2.

On March 1, 2016, plaintiff agreed to perform additional services related to the remedial investigation work under Contract # 2, at an estimated cost of $27,383.00. On March 11, 2016, plaintiff agreed to perform certain supplemental services related to the remedial investigation work in Contract # 2, at an estimated cost of $5,206.25. Plaintiff performed all required services and billed Pioli $60,230.70.

On November 30, 2016, plaintiff placed a $124,387.13 construction lien on defendant's property, after Pioli failed to make any payments regarding

4

Contract # 1 or the remaining payments owed under Contract # 2. On January 20, 2017, plaintiff filed a complaint seeking a determination that it acquired a "good and valid" construction lien on defendant's property, the amount of its lien, and the entry of a judgment against Pioli for all amounts due and owing, plus interest, costs, and attorney's fees. Additionally, plaintiff's complaint also asserted a claim of unjust enrichment.

Pioli filed an answer and counterclaim, alleging plaintiff breached its contracts and "started charging inflated invoices and changed its initial representation stating that it requires additional work and expenses [and] . . . further proceeded with the work that exceeds the initial cost estimate without acquiring [its] authorization in advance." Pioli further asserted plaintiff failed to request advance authorization before completing additional work under Contract # 1, in accordance with the contract.

Regarding Contract # 2, Pioli asserted plaintiff did not produce any report, which led Pioli to hire JCS Environmental Consulting Inc. (JSC) to finish plaintiff's work. Pioli sought $27,750 as reimbursement for payments it made to complete plaintiff's work. Pioli's counterclaim further alleged plaintiff breached the "implied covenant of good faith and fair dealing."

A-2314-18T1

On August 7, 2018, the matter proceeded to a bench trial. Eric Mertz, plaintiff's vice president and director of remediation services, testified first, recounting that he met with multiple Pioli principals prior to entering into Contract # 1. Mertz stated he did not advise any Pioli principal that BMS would pay plaintiff for the work on the property. He confirmed that, prior to the lawsuit, Pioli never claimed plaintiff did not finish a task or performed its work negligently or deficiently.

According to Mertz, he believed the contracts required him to obtain approval from Pioli to exceed the total budget but not to exceed individual task estimates, explaining it was general practice in the industry to shift the invoice costs for one task to another in order to keep the overall cost within budget. He stated, "The individual tasks are provided for accounting and budgetary purposes. Based on our knowledge at the beginning of the project, as the client requests more work in one area and requests less work in another area this results in exceeding budgets within tasks. . . ."

Mi Y. Linn, a Pioli employee, testified that, during contract negotiations, she was under the impression BMS would pay all charges incurred on Contract # 1. She confirmed Contract # 2 had nothing to do with BMS.

A-2314-18T1

The trial judge found plaintiff and Pioli entered into a valid contract, which included the extensions of the initial scope of work. She found Mertz's testimony credible and noted the testimony from Pioli's principals conceded that the work reflected in plaintiff's billing related to the scope of the work in Contract # 1.

The judge found the terms of the contracts, including Attachment A, clear and unambiguous and spoke for themselves. Based on this finding,

> [The] [c]ourt shall not consider any antecedent discussions, negotiations, or [parol] evidence to vary the terms of the contract as written and agreed upon. In this regard it is clear and undisputed that [Contract # 1] contains an integration provision within the standard terms and conditions in the first sentence of the first paragraph entitled agreement.

The judge found it undisputed that Contracts # 1 and # 2 did not contain "any language that reflected BMS was obligated to pay [plaintiff] or that [plaintiff] would only be paid upon Pioli being paid by BMS." Further, the judge noted Pioli failed to present evidence that it sent BMS any of the bills it received from plaintiff nor did it dispute any invoices until plaintiff filed suit.

The judge awarded plaintiff the full amount of Contract # 1 totaling $78,500.00. After deducting Pioli's two payments toward Contract # 2, the judge found the remaining balance on Contract # 2 and its two extensions equaled

7

$37,760.21. Therefore, the total amount owed on Contracts # 1 and # 2 totaled $116,261.21.

Additionally, the judge awarded plaintiff attorney's fees and contractual interest of eighteen percent for any unpaid balance and attorney's fees and costs relating to collection efforts. The contractual interest amounted to $71,276.64 and the attorney's fees amounted to $66,647.02. The judge entered an order for judgment in favor of plaintiff in the amount of $254,183.87.

The judge also found in favor of plaintiff on its quantum merit claim and ruled Pioli failed to refute any of the evidence plaintiff submitted. Specifically, the judge awarded plaintiff $8,126.92, which represented all of the work performed in excess of the face amounts of Contracts # 1 and # 2, plus prejudgment interest of $75.58, for a total judgment of $8,202.50.[1] The judge explained,

> [E]ven though [plaintiff] did not obtain written authorization pursuant to the subject contract terms, [t]his [c]ourt finds that Pioli received all the work performed by [plaintiff]. That Pioli certainly received the benefit from [plaintiff's] work. That [plaintiff] clearly expected payment for the work it performed, and that Pioli's failure to pay [plaintiff] for all work performed beyond its contractual right enriched Pioli.

_____

[1] On Contract # 1, plaintiff's final bill exceeded the estimated cost by $1,440.47. On Contract # 2 and the extensions thereto, plaintiff's final bill exceeded the estimated cost by $6,686.45.

The judge granted the foreclosure of plaintiff's construction lien after finding Pioli breached both contracts. The judge limited the lien to the outstanding balances from the breach of contract claim – $116,261.21, plus any statutory interest and tax costs, which equaled $71,276.64, for a total lien of $187,536.85.

The judge rejected Pioli's breach of contract counterclaim and dismissed it with prejudice. The judge found Pioli failed to meet its burden of establishing plaintiff performed incomplete or defective work. Additionally, the judge noted Pioli presented no evidence that it rejected any of plaintiff's invoices or objected to plaintiff's work as incomplete or defective.

The judge also dismissed Pioli's good faith and fair dealing claim with prejudice, finding Pioli failed to prove plaintiff acted with any bad motive or intention in the performance of its contracts or provided any evidence plaintiff's work was "unwarranted, defective, . . . or incomplete." The judge reasoned plaintiff's proposed estimates were based on the circumstances known at the time they were given, and plaintiff performed its work in good faith. Additionally, the judge found that plaintiff properly adjusted the actual work performed and billed accordingly.

## II.

"'Final determinations made by the trial court sitting in a non-jury case are subject to a limited and well-established scope of review.'" D'Agostino v.

A-2314-18T1

Maldonado, 216 N.J. 168, 182 (2013) (citation omitted). Appellate courts "give deference to the trial court that heard the witnesses, sifted the competing evidence, and made reasoned conclusions." Allstate Ins. Co. v. Northfield Med. Ctr., PC, 228 N.J. 596, 619 (2017) (citation omitted).

"Deference is especially appropriate 'when the evidence is largely testimonial and involves questions of credibility.'" Sipko v. Koger, Inc., 214 N.J. 364, 376 (2013) (citations omitted). The trial judge "has a better perspective than a reviewing court in evaluating the veracity of witnesses," and has "a 'feel' for the case that the reviewing court cannot enjoy." Twp. of W. Windsor v. Nierenberg, 150 N.J. 111, 132-33 (1997) (citation omitted).

"[A]ppellate courts should 'not disturb the factual findings and legal conclusions of the trial judge' unless convinced that those findings and conclusions were 'so manifestly unsupported by or inconsistent with the competent, relevant and reasonably credible evidence as to offend the interests of justice.'" Allstate, 228 N.J. at 619 (quoting Rova Farms Resort, Inc. v. Investors Ins. Co. of Am., 65 N.J. 474, 484 (1974)).

Pioli argues the trial judge failed to find "whether the parties ha[d] a meeting of minds on who will eventually pay for the services rendered by [plaintiff]" and only relied on the standard terms and conditions, which do not indicate who pays the

estimated costs. Specifically, Pioli claims Mertz told Pioli prior to the signing of the contract plaintiff "would forbear from seeking payment from Pioli for [Contract # 1] and that [plaintiff] would have BMS eventually pay for the work rendered by [them]."

In reviewing disputed contract terms, we apply well-established guiding principles. A court interpreting a contract seeks "to ascertain the 'intention of the parties to the contract as revealed by the language used, taken as an entirety . . . , the situation of the parties, the attendant circumstances, and the objects the parties were striving to attain.'" Borough of Princeton v. Bd. of Chosen Freeholders of Mercer, 333 N.J. Super. 310, 325 (App. Div. 2000) (alteration in original) (quoting Cruz-Mendez v. ISU/Ins. Servs., 156 N.J. 556, 570-71 (1999)).

We "must consider contractual language in the context of the circumstances at the time of drafting and . . . apply a rational meaning in keeping with the expressed general purpose. [I]f the contract into which the parties have entered is clear, then it must be enforced as written." Serico v. Rothberg, 234 N.J. 168, 178 (2018) (alterations in original) (quoting In re Cty. of Atlantic, 230 N.J. 237, 254-55 (2017)). "Contracts should be read 'as a whole in a fair and common sense manner.'" Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014) (quoting Hardy ex rel. Dowdell v. Abdul-Matin, 198 N.J. 95, 103 (2009)). Courts generally give

contractual terms their plain and ordinary meaning. Schor v. FMS Fin. Corp., 357 N.J. Super. 185, 191 (App. Div. 2002). "A party that uses unambiguous terms in a contract cannot be relieved from the language simply because it had a secret, unexpressed intent that the language should have an interpretation contrary to the words' plain meaning." Ibid.

"Where the terms of an agreement are clear, [courts] ordinarily will not make a better contract for the parties than they have voluntarily made for themselves, nor alter their contract for the benefit or detriment of either, particularly in a commercial, arms-length setting." Carroll v. United Airlines, Inc., 325 N.J. Super. 353, 358-59 (App. Div. 1999). In determining the parties' intent, "[t]he document . . . must be read as a whole, without artificial emphasis on one section, with a consequent disregard for others." Borough of Princeton, 333 N.J. Super. at 325. "A basic principle of contract interpretation is to read the document as a whole in a fair and common sense manner." Porreca v. City of Millville, 419 N.J. Super. 212, 233 (App. Div. 2011) (quoting Hardy, 198 N.J. at 103).

The trial judge found that the contractual language spoke for itself and the language in the contract – including Attachment A – was "clear and unambiguous." The judge found it was undisputed that no language in the contract pointed to BMS paying plaintiff for services rendered to Piloli. Plaintiff and Pioli are the only parties

stated in the first contract. In plain language, Contract # 1 incorporated Attachment A. Attachment A stated that it, along with Contract # 1, constituted the entire contract.

We agree with the trial judge that the contract is clear and unambiguous. Contract # 1 concerns a service contract between plaintiff and Pioli. The only fair and reasonable interpretation of this contract is that Pioli would pay plaintiff for the services rendered to Pioli to address a contamination of Pioli's property. Manahawkin, 217 N.J. at 118. We must defer to the judge's findings because she reasonably based her decision on competent evidence, including the parties' contract and Mertz's credible testimony. Allstate, 228 N.J. at 619.

Pioli next argues the trial court erred in applying the parol evidence rule in regards to the incorporation clause set forth in the standard terms and conditions included in Attachment A. Pioli asserts the judge should have admitted extrinsic evidence, arguing it does not alter the meaning of the terms of the contract because the contract is silent regarding who pays plaintiff.

Because the trial judge found Contract # 1 clear and unambiguous, she correctly applied the parol evidence rule. See Conway v. 287 Corporate Ctr. Assocs., 187 N.J. 259, 268 (2006) (holding the parol evidence rule prohibits the introduction of evidence that tends to alter an integrated written document).

Contract # 1 contains a clear merger and integration clause stating it is a final integrated document that includes Attachment A. Thus, the judge correctly ruled Pioli could not introduce extrinsic evidence regarding discussions that preceded the signing of Contract # 1 to try to prove its claim that plaintiff agreed BMS, not Pioli, would pay plaintiff for the work it performed on the property.

Moreover, Pioli did not present any documentation that BMS acknowledged an obligation to pay plaintiff for its work. Thus, without any relevant admissible evidence referencing the parties' contracts, the record is devoid of any evidence the contracts did not represent the parties' final expression of their agreements. See Chance v. McCann, 405 N.J. Super. 457, 564 n.6 (App. Div. 2009) (holding a writing that reasonably appears to be a complete agreement is taken to be an integrated agreement unless it is established by other evidence that the writing did not constitute a final expression). Contract # 1 identifies Pioli as the "client" in the contract and outlines a procedure for payment. Pioli's argument that the parties' contracts do not constitute integrated written agreements clearly lacks substantive merit.

### III.

Pioli further argues it proved by a preponderance of the evidence plaintiff acted "with bad motives or intentions or engaged in deception or evasion in the

performance of contracts and by such conduct denied Pioli" the benefit of its bargain. In addition, Pioli claims it proved plaintiff intentionally proceeded with specific tasks beyond the cost estimate without its authorization and overcharged on other tasks.

"Every contract in New Jersey contains an implied covenant of good faith and fair dealing." R.J. Gaydos Ins. Agency, Inc. v. Nat'l Consumer Ins. Co., 168 N.J. 255, 276 (2001). "Proof of 'bad motive or intention' is vital to an action for breach of the covenant [of good faith and fair dealing]." Id. at 225. (quoting Wilson v. Amerada Hess Corp., 168 N.J. 236, 251 (2001). "The party claiming a breach of the covenant of good faith and fair dealing must provide evidence sufficient to support a conclusion that the party alleged to have acted in bad faith had engaged in some conduct that denied the benefit of the bargain originally intended by the parties." Ibid. (internal quotations omitted).

In support of its claim that plaintiff acted in bad faith, Pioli cites to Brunswick Hills Racquet Club, Inc. v. Route 18 Shopping Center Assocs., 182 N.J. 210, 230-231 (2005). In that case, a commercial tenant was lulled into a false sense of security that it had properly exercised an option for a ninety-nine-year lease nineteen months before the end of the lease term. Id. at 216-19. The landlord failed to notify the tenant that the exercise of the option required payment of $150,000 and did not

respond to direct inquiries over many months. Ibid. The landlord's conduct resulted in a "windfall increase" in the rental amount at the end of the lease term at the tenant's literal expense. Id. at 231. The landlord achieved unjust enrichment by "lull[ing] plaintiff" through "a series of evasions and delays." Ibid.

In contrast to Brunswick Hills, plaintiff here repeatedly sent Pioli invoices reflecting the work it performed. Pioli never responded to the invoices plaintiff submitted and yet allowed plaintiff to continue working on its property. The trial judge found Pioli presented no evidence plaintiff's work was unwarranted or defective. Importantly, the judge found Mertz credible, accepting his explanation that obtaining approval for every task was not common practice. The judge further found plaintiff acted in good faith in submitting its invoices. Accordingly, the judge did not err in rejecting Pioli's claim that plaintiff breached the covenant of good faith and fair dealing. The judge came to a reasonable conclusion based on Mertz's credible testimony. The record simply lacks any credible evidence supporting the claim of a bad motive or intention on plaintiff's part.

IV.

Under the Construction Lien Law, a lien fund exists if a property owner has paid the general contractor less than the value of the work completed. N.J.S.A. 2A:44A-9(a). A lien fund is limited to "the earned amount of the contract between

the owner and contractor minus any payments made prior to service of a copy of the lien claim." N.J.S.A. 2A:44A-9(b)(1). "[N]o lien fund exists, if, at the time of service of a copy of the lien claim, the owner . . . has fully paid the contractor for the work performed . . . ." N.J.S.A. 2A:44A-9(d).

The primary purpose of the Construction Lien Law is to secure payment to subcontractors and others who provide work, services, or materials pursuant to a written contract. See NRG REMA, LLC v. Creative Envtl. Sols. Corp., 454 N.J. Super. 578, 587 (App. Div. 2018), certifs. denied, 234 N.J. 577, and 235 N.J. 111.

Having found Pioli breached its contract, we agree with the trial judge that plaintiff was entitled to place a lien for its services rendered. See N.J.S.A. 2A:44A-9(b)(1). Additionally, Pioli concedes it "waived its objection on the timeliness of filing and service of the lien" but argues the lien has no merit because BMS was responsible for paying plaintiff. As previously noted, this claim finds no support in the record. We therefore conclude the judge correctly ruled in plaintiff's favor, entering a lien for the outstanding balance of $116,260.21, plus interest of $71,276.64 as provided in the parties' contract, for a total of $187,536.85.

V.

Quantum meruit is a form of quasi-contractual recovery that "rests on the equitable principle that a person shall not be allowed to enrich himself unjustly at

the expense of another." Starkey v. Estate of Nicolaysen, 172 N.J. 60, 68 (2002) (quoting Weichert Co. Realtors v. Ryan, 128 N.J. 427, 437 (1992)). To recover under a theory of quantum meruit, a party must establish: "(1) the performance of services in good faith, (2) the acceptance of the services by the person to whom they are rendered, (3) an expectation of compensation therefor, and (4) the reasonable value of the services." Ibid. (quoting Longo v. Shore & Reich, Ltd., 25 F.3d 94, 98 (2d Cir. 1994)). Courts may not impose additional contractual obligations under quasi-contract theories "where there is a valid unrescinded contract that governs their rights." Shalita v. Twp. of Washington, 270 N.J. Super. 84, 90 (App. Div. 1994).

Unjust enrichment requires a party to "show both that [the other party] received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994) (quoting Assocs. Commercial Corp. v. Wallia, 211 N.J. Super. 231, 243 (App. Div. 1986)). The party seeking payment under an unjust enrichment theory must also show it "expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights." Ibid. (quoting Wallia, 211 N.J. Super. at 244).

The trial judge initially determined plaintiff's billing on Contracts # 1 and # 2 exceeded the estimated figures for both contracts, $1,440.47 for Contract # 1 and

$6,686.45 for Contracts # 2; however, the judge noted that these stated amounts were just that – estimates.

In ruling on plaintiff's quantum meruit claim, the judge analyzed the relevant factors and came to a reasonable conclusion. The judge found no evidence plaintiff improperly manipulated the estimated costs; rather, she found plaintiff performed additional services at Pioli's request, the amounts stated in the contracts represented estimates, and Pioli did not object to the invoices rendered until plaintiff filed the current lawsuit. The record supports the judge's decision to award plaintiff $8,126.92 for work performed in addition to the work required by the contracts. The judge properly applied the quantum meruit doctrine. Allowing Pioli to retain the benefit of plaintiff's work, but not pay for it, would constitute an inequitable result. We discern no basis to disturb the trial judge's ruling on this issue.

Any arguments not specifically addressed in this opinion lack sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E)

Affirmed.

I hereby certify that the foregoing
is a true copy of the original on
file in my office.

CLERK OF THE APPELLATE DIVISION

A-2314-18T1